(INSTANCE COURT.)

## The Aurora.—WALDEN ET AL. Claimants.

A hypothecation of the ship by the master is invalid, unless it is shown by the creditor, that the advances were necessary to effectuate the objects of the voyage, or the safety of the ship; and the supplies could not be procured upon the owner's credit, or with his funds, at the place.

A bottomry bond given to pay off a former bond, must stand or fall with the first hypothecation, and the subsequent lenders can only claim upon the same ground with the preceding, of whom they are virtually the assignees.

APPEAL from the circuit court for the district of Pennsylvania. The brig Aurora, commanded by captain Owen F. Smith, and owned by the claimants, sailed in July, 1809, from New-York, on a trading voyage to the Brazils, and from thence to the South Sea islands, for the purpose of procuring a cargo for the market of Canton or Manilla; with liberty, after completing this adventure, to continue in this trade, or engage in that between Canton and the north-west coast of America. The brig duly arrived at Rio Janeiro, where the principal part of her outward cargo was sold, and from thence proceeded to Port Jackson, in New Holland. At this port, the brig underwent considerable repairs; on account of which, advances and supplies were furnished by Messrs. Lord & Williams, who were merchants there. The original objects of the voyage seem here to have

been lost sight of, and the brig was chartered by the master, to Messrs. Lord & Williams, for a voyage of discovery, and was actually retained in their service for about a year, under this engagement. At the end of this time the brig had returned to Port Jackson, and captain Smith was here put in gaol, by some persons whose names are unknown, for debts contracted, as it was asserted or supposed, on account of the vessel, and was relieved from imprisonment by Messrs. Lord & Williams. About this time, viz. in July, 1811, the brig was again chartered to Messrs. Lord & Williams, for a voyage from Port Jackson to Calcutta, and back to Port Jackson; and a bottomry bond was executed for the same voyage by captain Smith, in favour of Messrs. Lord & Williams, for the sum of 1,482*l.* 6*s.* 1*d.*, and interest at nine per cent.: being the amount, as the bond expresses it, of " charges incurred for necessaries and stores, found and provided by Messrs. Lord & Williams, of, &c., at various times and places, for the use of the said brig." The vessel duly proceeded to Calcutta, and landed her cargo there; but being prevented, as it was alleged, by the British government in Calcutta, from returning to Port Jackson, the voyage was broken up. In December, 1811, captain Smith entered into a contract with the libellants, Messrs. Chamberlain & Co., at Calcutta, by which he engaged to charter the brig to them, to carry a cargo on their account to Philadelphia, for the gross freight of 12,000 sicca rupees, to be paid to him in advance in Calcutta; and, also, to give the charterers the appointment of the master for the voyage.

1816.

The Aurora.

He farther agreed, in consideration of the libellants paying the bottomry bond of Messrs. Lord & Williams, and advancing any sums necessary for the repairs and supplies of the ship, to execute a bottomry bond to them for the same voyage, for the principal sum thus paid and expended, and 20 per cent. interest. In pursuance of this agreement, on the 17th of December, a certain captain George Lee, with the assent of Smith, was appointed by the libellants to superintend the repairs, equipments, and loading of the brig, and afterwards sailed as master on the voyage. A bottomry bond, for 18,000 sicca rupees, was formally executed by captain Smith on the 23d, and a charter party on the 26th December. In the latter part of January, 1812, captain Smith resigned his nominal command of the ship to captain Lee, and delivered to him the ship's papers, and letters for the owners. The ship duly sailed on the voyage, and arrived at Philadelphia, and there safely delivered her cargo. The advance freight was paid to captain Smith, according to the contract, and he remained behind at Calcutta, under the pretence, that, with this advance freight, it was his intention to prosecute the plan of his original voyage, and to endeavour to repair the losses sustained by his former conduct. It also appeared in evidence, that captain Smith was, during the whole voyage, much addicted to intoxication, both at sea and on shore; and Messrs. Lord & Williams, and the libellants, seem to have been fully apprized of his incapacity to manage the concerns of the voyage. The owners refused to pay the bottomry bond executed at Calcutta, and the

present libel was brought to enforce it. The district court, at the hearing, decreed the full amount of the principal and interest of the bond, deducting the 12,000 sicca rupees advanced at Calcutta. Upon an appeal, the circuit court reversed this decree, and upon the merits dismissed the libel.

*Harper*, for the appellants and libellants. 1. As to the first hypothecation at Port Jackson: a bottomry bond may be taken after debts are incurred necessarily, in order to secure the person advancing the moneys. 2. The hypothecation at Calcutta was to discharge the first loan, and for further repairs. The master was not, in effect, changed before the second bond was executed. But, suppose he was, how is that to affect the first hypothecation? It attached until discharged by the new loan. The instrument passes by delivery, and the new lenders became invested with all the rights of the former holders of the bond. The present holders ought, at least, to receive so much of their money All that lenders upon bottomry are bound to do, is, to see that a necessity actually exists at the time. How came the ship enabled to prosecute her voyage and earn freight? By the loan. The payment of the freight in advance to the master, subsequently, could not, by relation back, affect the lien acquired by a previous loan.

*Sergeant*, for the respondents and claimants. The power of a master to hypothecate the vessel, though necessary for the purposes of commerce, would,

without limitations, be ruinous to the owner, and destructive of the purposes it was intended to subserve. It is conferred by no express delegation, but is the offspring of necessity. This necessity must be shown, to warrant the master's conduct. The owner's interest is the object of the power; the master has no authority to bind the owner or his property, contrary to his orders and his interest. 1. The master can hypothecate only in case of clear necessity, which must be clearly shown.[a] It is incumbent upon the party who claims to have a right under the bond, to show this necessity. A contrary doctrine would make the bond, which is nothing unless the master has the power, evidence of that power. To allow it the force even of *prima facie* evidence, would be to invert the law; for, then, instead of saying, that the state of necessity must be clearly shown, we should be obliged to say, the absence of necessity must be shown. 2. The master can hypothecate only when the hypothecation is the *condition of the loan.* The money ought to be advanced solely on the faith of the bond, and the hypothecation cannot be taken after the advances are made, without stipulating for such security. If the loan has been once made on personal credit, for the use of the ship, it cannot be afterwards secured by hypothecation; for there is, then, no *existing necessity.* A menace against the master, or the power.

a 2 *Marshall on Insurance,* (Condy's edit.) 741, d. Ross v. The Active. *Bee's Adm. Rep.* 159. Putnam v. The Polly. 2 *Marshall,* 741, c. The Lavinia.

of attaching the ship, by the creditor, will not legalize such a contract.[b]  If the master can obtain funds by any other means, he is not authorized to hypothecate.  The master can hypothecate only for the interest of the owner, and for the purpose of prosecuting the voyage.[c]  This is a case which requires the application of the strictest principles of law; and, at the same time, illustrates the wisdom and policy of those principles, as essential to the security of trade.  The hypothecation at Calcutta, so far as it is founded upon that at Port Jackson, was given, in part at least, for a pre-existing debt; and it is not for us to separate what the obligees have confounded and mixed together.  As to the expenditures at Calcutta, the freight received ought to have been applied to pay them.

*Harper*, in reply.  The principles advanced on the other side are too narrow to subserve the interests of trade; and the authorities cited do not warrant them.  Any condition of a ship, disabling her from performing her usual service to the owner, if money cannot be raised in any other way to refit her, creates such a necessity as will justify a hypothecation by the master.  Do not the claims of material men, of tradesmen who have furnished supplies upon the credit of the ship, of merchants who have advanced moneys for her repair, and who may all pro-

1816.
The
Aurora.

*b* 2 *Marshall*, 741, a.  Liebart v. Emperor.  *Ib.* Rucker v. Conyngham.  *Bee's Adm. Rep.* 341.

*c* 2 *Marshall*, 741, c.  Ross v. Active.  *Parke on Ins.* 413.

ceed *in rem*, or by process of attachment, imply such a condition of the ship? By the universal law of the civilized world, the master is the agent of the owner, unless notice of his special instructions to the party contracting with him, can be proved. The lenders in this case had no such notice.

Feb. 29th.

STORY, J., delivered the opinion of the court, and, after stating the facts, proceeded as follows :

Such are the material facts of the case, and the question to be decided is, whether, under all the circumstances, the bottomry bond executed at Calcutta constitutes a valid lien upon the ship.

The law in respect to maritime hypothecations is, in general, well settled. The master of the ship is the confidential servant or agent of the owners; and they are bound to the performance of all lawful contracts made by him, relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use. This rule is established as well upon the implied assent of the owners, as with a view to the convenience of the commercial world. As, therefore, the master may contract for repairs and supplies, and thereby, indirectly, bind the owners to the value of the ship and freight, so, it is held that he may, for the like purposes, expressly pledge and hypothecate the ship and freight, and thereby create a direct lien on the same, for the security of the creditor. But the authority of the master is limited to objects connected with the voyage, and, if he transcend the prescribed limits, his acts become, in legal contemplation, mere nullities. Hence, to make

a bottomry bond executed by the master a valid hypothecation of the ship, it must be shown by the creditor that the master acted within the scope of his authority; or, in other words, it must be shown that the advances were made for repairs and supplies necessary for effectuating the objects of the voyage, or the safety and security of the ship; and no presumption should arise, that such repairs and supplies could be procured upon any reasonable terms, with the credit of the owner, independent of such hypothecation. If, therefore, the master have sufficient funds of the owner, within his control, or can procure them upon the general credit of the owner, he is not at liberty to subject the ship to the expensive and disadvantageous lien of an hypothecatory instrument.

Let us now, with these principles in view, proceed to the consideration of the validity of the bottomry bond executed at Port Jackson, which enters so materially into the subsequent one executed at Calcutta. This bond purports, on its face, to have been given for advances, or supplies, furnished for the ship's use, not immediately before its date, but at various times and places; and, from the other evidence in the case, it distinctly appears that the greater part was furnished before and during the voyage of discovery in which she was engaged, under the contract with Messrs. Lord & Williams, and for their immediate benefit. Not the slightest account is given of the earnings of the ship during this long voyage of a year, nor of the terms or stipulations of the charter. This silence would be wholly unaccounta-

ble if it were not in proof, that captain Smith was guilty of the most shameful misconduct, and either fraudulently sacrificed, or grossly neglected, the interests of his owner.

The advances made by Messrs. Lord & Williams do not appear to have been originally made upon a stipulation for an hypothecation of the ship. On the contrary, there is the strongest reason to believe that they were originally made upon the general credit of the owner, or master, or both. If there had been a stipulation for an hypothecation, it must have been carried into effect by the parties on the next ensuing voyage; and, as this was not done, there arises an almost irresistible presumption, that Messrs. Lord & Williams looked for their reimbursements out of the freight of the voyage in which the ship was then engaged by them. If, indeed, there had been a stipulation, originally, for an hypothecation, it must be deemed, in point of law, to have been waived by the omission to have had it attached to the first voyage then next to be prosecuted; and the party who thus waives his right cannot be permitted, at a subsequent time, and under a change of circumstances, to reinstate himself in his former condition to the injury of the owner. It is said that the ship might have been arrested for these advances; and that, in point of fact, the captain was put in jail on account of debts contracted for the ship, and was relieved from imprisonment by Messrs. Lord & Williams. That captain Smith was imprisoned on account of some debts appears in the evidence, but it is by no means clear that these

debts were contracted for the use of the ship. The presumption is repelled by the consideration that the necessaries and supplies are expressly stated in the bond to have been furnished by Messrs. Lord & Williams; and the only other creditors who are alleged to have furnished stores, are admitted not to have instituted any suits. It is undoubtedly true, that material men, and others, who furnish supplies to a foreign ship, have a lien on the ship, and may proceed in the admiralty to enforce that right. And it must be admitted that, in such a case, a *bona fide* creditor, who advances his money to relieve the ship from an actual arrest on account of such debts, may stipulate for a bottomry interest, and the necessity of the occasion will justify the master in giving it, if he have no other sufficient funds, or credit, to redeem the ship from such arrest. But it would be too much to hold, as was contended for by the counsel for the appellants, that a mere threat to arrest the ship, for a pre-existing debt, would be a sufficient necessity to justify the master in giving a bottomry interest, since it might be an idle threat, which the creditor might never enforce; and until enforced the peril would not act upon the ship itself. And even supposing a just debt might, in such a case, be a valid consideration to sustain a bottomry interest in favour of a third person, such an effect never could be attributed to a debt manifestly founded in fraud or injustice. Nor does it by any means follow, because a debt sought to be enforced by an arrest of the ship, might uphold an hypothecation in favour of a third person, that a general creditor would be en-

titled to acquire a like interest. It would seem against the policy of the law to permit a party, in this manner, to obtain advantages from his contract for which he had not originally stipulated. It would hold out temptations to fraud and imposition, and enable creditors to practise gross oppressions, against which even the vigilance and good faith of an intelligent master might not always be a sufficient safeguard in a foreign country.

These are not the only difficulties which press upon the claim of Messrs. Lord & Williams. The terms of the charter-party, entered into by them on the voyage to Calcutta, as well as on the voyage of discovery, are nowhere explained. It was certainly their duty, in the first instance, to apply the freight in their hands, earned in these voyages, to the discharge of the debt due to them for advances. What was the amount of this freight, and what was the manner in which it was to be paid, and how, in fact, it was paid or appropriated, are inquiries which have never been answered. These inquiries are at all times, and in all cases, important, but are emphatically so in a case where there is but too much reason to suspect that the interests of the owner were wilfully abandoned by the fraud or the folly of the master.

It is incumbent upon the creditor who claims an hypothecation, to prove the actual existence of the necessity of those things which give rise to his demand; and if, from his own showing, or otherwise, it appears that he has had funds of the owners in his possession which might have been applied to the de-

1816.

The
Aurora.

mand, and he has neglected or refused so to do, he must fail in his claim. So, if various demands are mixed up in his bond, some of which would sustain an hypothecation and some not, it is his duty so to exhibit them to the court that they may be separately weighed and considered. And it would be perilous indeed, if a court were called upon to grope its way through the darkness and intricacies of a long account, without a guide, and decide upon the interests of the ship owner by obscure and doubtful lights which here and there might cross the path.

Upon the whole, it is the opinion of the court, that the bottomry bond of Messrs. Lord & Williams cannot be sustained as a valid hypothecation upon the proofs now before the court. It appears to have been founded, to a very large amount, upon advances made by Messrs. Lord & Williams, in previous voyages; and if some portion of the debt might have been immediately applicable to the necessities of the ship at the time of the voyage to Calcutta, that portion is not distinctly shown, and no reason as yet appears why the freight in their hands, if the transactions were *bonà fide*, might not have been applied in discharge of these necessities.

As the bottomry bond of Messrs. Lord & Williams has not been established, the subsequent bottomry bond executed at Calcutta, so far as it includes and covers the sum due on the first bond, cannot be sustained. The plaintiffs, in this respect, can claim only as the virtual assignees of Messrs. Lord & Williams, with the assent of the master, and the same defects which infected the original title pass along

with the muniments of that title under the assign‑
ment.

And this observation leads to the consideration of
the validity of the bottomry bond executed at Cal‑
cutta, as to the sum remaining, after deducting the
amount of the first bond. Notwithstanding some
obscurity in the testimony, it must be taken as true,
from the express acknowledgments of captain
Smith, that the whole sum expended in repairs and
supplies of the ship in Calcutta, including the sum
of ten thousand seven hundred and thirteen sicca
rupees, paid on account of the first bottomry bond,
did not exceed the sum of eighteen thousand sicca
rupees. It follows, therefore, that a sum, a little
more than six thousand rupees, was expended in
these supplies and repairs. By their charter-party
with the master, the plaintiffs agreed to pay an ad‑
vance freight to captain Smith of twelve thousand
sicca rupees for the voyage to Philadelphia. There
was, therefore, within their own knowledge, an ample
fund provided for all the repairs and supplies neces‑
sary for the voyage ; and this fund absolutely with‑
in their own control, if they were disposed to act for
the interest of the owners, instead of lending their
aid still farther to involve them in difficulty and dis‑
tress. There is, therefore, but too much reason to
believe, that the plaintiffs were not unwilling to de‑
rive undue advantages from the intemperance and
negligence of the master, whatever might be the
sacrifices brought upon the owners. The plaintiffs
expressly stipulated, in their charter-party, for the
right to appoint a new master for the voyage; ob‑

viously from a total want of confidence in captain Smith. They would not even suffer the repairs and loading of the ship to be made, except under a master specially in their own confidence. They retained captain Smith in the nominal command of the ship until all their own purposes were answered, and then discarded him with as little ceremony as any indifferent personage. Yet, at the very moment that they were withdrawing their whole confidence from him, the advanced the whole freight of the voyage, to be applied at his own pleasure to any objects disconnected with the voyage. They could not be ignorant that the master was not about to return to the home of the owner, and that the ship was; and the argument which imputes to them a collusive combination with the master, is certainly not without considerable weight. At all events, here funds are shown to exist sufficient to meet the necessities of the ship, and, consequently, a resort to the extraordinary expedient of an hypothecation was not justified in point of law.

On the whole, it is the opinion of the court, that the decree of the circuit court ought to be affirmed, with costs.

Decree affirmed.[d]

---

d It is stated by *Blackstone*, in the *Commentaries*, vol. 2. p. 457., that the contracts of bottomry and respondentia took their rise from the practice of allowing the master to hypothecate the ship in a foreign country, in order to raise money to refit. This opinion is doubted by Mr. *Abbott*, in his *Law of Shipping*, part 2. c. 3. s. 15. p. 163. (Story's ed.) who remarks, that there is no mention in the text of the civil law, of this contract entered into by the *master* of the ship *in that character*. This remark does not appear to

1816.

The Aurora.

1816.

The
Aurora,

have been made with the usual accuracy of that excellent writer; for, in the law, *De exercitoria actione* in the Pandects, the master is authorized to take up money upon the credit of the ship when necessary; and *Bynkershoek* attributes the origin of maritime hypothecation to the Roman law, and states, that it was originally confined to hypothecation by the master, from necessity, in foreign parts, and by degrees came to be entered into by the owners of the ship and cargo for more general purposes. *Q. J. Priv.* l. 3. c. 15., *De Contractu qui dicitur*, Bodemery. The same great jurist also states in his *Q. J. Pub.* c. 19. p. 151., of Du Ponceau's translation, that the lender is entitled to the benefit of his security, even if the moneys advanced be misapplied by the master, and not laid out in the refitting the ship. This, however, must be understood of a *bona fide* case, where there is no fraud on the part of the lender, nor collusion between him and the master. *Roccus* lays down the following rules on this subject: " *Verum adverte, quia quatuor requiruntur, ut dominus navis teneatur ad restitutionem pecuniæ mutuatæ. Primum, ut causa sit vera, et in illam causam pecunia sit versa, licet precise creditor non teneatur habere curam, ut in illam causam pecunia expendatur. Secundo, quod mutuans sciat magistrum ad id esse propositum. Tertio, ut non plus mutuetur, quam sit navi*

*necessarium dictæ refectioni, vel causæ. Quarto, ut in eo loco comparari possint res illæ necessariæ, ubi mutuum fuit factum.*" He adds, that if the master deceive the lender, either in the repairs or the price of the articles purchased, the owner is responsible, and also for money borrowed to repay other moneys advanced to refit the ship; nor is he discharged even if the master converts the money to his own use. *Notabilia de Nav. et Naul.* note 23, 24. The *Consolato del Mare* recognises the power of the master to bind the owners in this manner, excepting in cases of fraud and misconduct, c. 245. By the ancient law of France, the master might hypothecate the ship when abroad, with the consent of the mate and pilot, who were required to certify upon the ship's journal the necessity of the loan, and its application. *Ordonnance de la Marine*, liv. 2. tit. 1. *du Capitaine*, art. 19. Usage also required that a *proces verbal* of the transaction should be copied from the journal, and signed by the parties, whose consent was necessary. But *Valin* informs us that these formalities were merely required in order to disculpate the master; that they were not of the essence of the contract, and the omission of them did not invalidate the security of the lender, who was not obliged to prove that the sums advanced had been appropriated to the use of the vessel; and he cites a sentence of

the tribunal at Marseilles, of the 9th of August, 1748, in support of his exposition, which decision (he states) is founded upon the first law, s. 9. Dig. *de exercitoria actione*. He remarks that Loccenius, *de Jure Maritimo*, l. 3. c. 8. n. 7. and 8., Vinnius in Peckium, fol. 183. n. A., and Casaregis, *Disc.* 71. n. 15. 33. and 34., hold, that the lender should prove the necessity of the loan in order to prevent ship owners from being the victims of the frauds and malversations of masters. But *Valin* alleges that this rule had been rejected by the usage of trade as too refined and subtle; and that to enable the lender to enforce his claim, it is sufficient to show that he had acted with good faith; that is to say, that there is no proof or sufficient presumption of collusion between him and the master. *Valin sur l' Ordonnance,* tom. 1. p. 442. See also *Pothier, de Pret a la Grosse,* n. 52. In the new Commercial Code of France, the farther precaution is added of requiring that the master should obtain the consent of a tribunal of commerce, or justice of the peace, if the loan be made in France; if abroad, by the French consul, or if there be no consul, by the magistrate of the place. *Code de Commerce,* liv. 2. tit. 4. *Du Capitaine,* art. 234. This amendment to the ancient law was made upon the suggestion of the Tribunal and Chamber of Commerce of Caen, who remarked, in their observations upon the original plan of the Code, that it but too often happened that ship masters, in the course of their voyage, put into port upon the most frivolous pretexts, and incurred expenses ruinous to the owners: which required the interposition of judicial authorities, who would certainly authorize no other expenses than those really urgent and necessary to the prosecution of the voyage. *Esprit du Code de Commerce, par J. G. Locre,* tom. 3. p. 112.