## SUPREME COURT—IN ADMIRALTY.

MANUEL ENOS *vs.* N. W. SOWLE.

IT is the duty of the Courts of this Kingdom, sitting as Courts of Admiralty, to exercise jurisdiction in suits between foreigners, in cases of special necessity, and in order to prevent a failure of justice.

The Court will exercise such jurisdiction in accordance with the general, well known principles which govern the Admiralty Courts of civilized nations, and under a sound judicial discretion, based upon the circumstances of each particular case.

Where the libel contained allegations of peculiar injustice and long continued injury, and the domestic forum was in a distant country where it would be impossible to procure the testimony of witnesses, to deny its consideration would be a dereliction of duty to the laws of the sea, and a virtual denial of justice, and the protest of the Consul of the United States to the exercise of the jurisdiction, in such a case, overruled.

By a plain construction of the twenty-first article of the French treaty, the jurisdiction of crimes, committed on the high seas, as well as of marine torts, " as causes of actions for damages " on the Admiralty side of the Court, remains as it was before the treaty was made.

A tort, disconnected from and having no relation to the *internal order* of the vessel is not within the purview of the stipulation of the French treaty.

In the meaning and intent of the French treaty a seaman, shipping on board of a foreign vessel, does not become, by that act of shipment, a citizen or subject of the nation to which said vessel belongs.

To give the Consul exclusive cognizance of any tort or crime, committed on board of any vessel of his country, while in the ports of this Kingdom, the contending parties must be of the same nationality as that to which the vessel belongs.

There is no such comity of nations as requires the approval or consent of the Foreign Representative to confer jurisdiction; there may be cases where such acquiescence would be indispensable and proper, and others where it is

Manuel Enos *v.* N. W. Sowle.

not necessary, from the inability of the Consul to afford redress, and where a failure of justice would ensue.

ALLEN, C. J.

Decision on the question of jurisdiction.

This is a libel for a marine trespass, or what is in the technical language of Admiralty called a cause of damage, brought by the libellant for certain wrongs and injuries, alleged by him to have been inflicted by the libellee.

The libel alleges that libellant is a native of the Western Isles; that, being at New Bedford, in America, in November, 1857, he shipped as cabin boy on board of the "Montreal," Nathaniel W. Sowle, master; that, soon after sailing, Sowle attempted to commit sodomy upon him, which he resisted; that subsequently, upon the arrival of the ship on the coast of California, he ran away from her; that, being at Lahaina, Island of Maui, the said Sowle caused him to be brought back on board the said ship, in which he sailed again on a cruise to the North, during which the said Sowle succeeded, by threats and his physical powers, in committing the crime of sodomy; that, on arriving at Honolulu from that cruise, libellant again deserted from the "Montreal," and escaped on board of the "Dromo," in which he sailed to Nangasaki, in Japan, where he was again retaken by Sowle and forcibly carried back on board the "Montreal," and went North for another cruise, during which he was again compelled by Sowle to submit to his unnatural embraces and desires.

Protesting against the jurisdiction of the Court, an answer is filed which denies the material allegations of wrong and injury to his person, and the case proceeds to trial, subsequently to which the Consul of the United States files a protest against the jurisdiction of the Court for the following reasons:

1st. Libellant and libellee are citizens of the United States, and the vessel, under command of the latter, is owned by citizens of the United States, and bears the flag of that country.

2d. That the alleged causes of action, if any there be, arose on said vessel, and while on the high seas, and beyond the jurisdiction of his Hawaiian Majesty's Courts.

3d. That it has not been usual for Courts of Admiralty, in

cases of this kind and under these circumstances, to entertain jurisdiction without the consent of the Representative of the foreign Government to which the parties belong ; and that, in this case, no such consent has been given ; on the contrary, the said Consul has been instructed by the Diplomatic Representative of the United States, accredited near the Court of His Hawaiian Majesty, to respectfully enter a protest against this Court taking jurisdiction in the case.

4th. That by the twenty-first article of the treaty between his Hawaiian Majesty and his Imperial Majesty the Emperor of France, ratified on the 8th of September, 1858, it is provided that Consuls shall have the *exclusive* charge of the internal order on board of the merchant vessels of their nations, and the said Consuls are *alone* authorized to take cognizance of all crimes, misdemeanors, and other matters of *difference* in relation to said internal order, which may supervene between the master, the officers and crew, and the local judicial authorities are not to interfere unless by the approval or consent of the Consuls.

5th. That by the parity clause of the Treaty between the United States and this Government, the citizens of the United States are entitled to the same advantages as are given to the citizens of France by virtue of the Treaty with that Empire.

We have given the causes of the protest our most deliberate and careful consideration. This was due to the distinguished source from which it emanated, as well as to important principles which it involves, and the rights of the parties.

Parsons, an eminent American jurist, in his Work on Maritime Law, (2d vol., p. 543,) says : " It seems to be well settled, after some controversy, that an Admiralty Court has full jurisdiction over suits between foreigners, if the subject matter of the controversy is of a maritime nature. It is however a question of discretion in any case, and the Court will not take cognizance of the cause, if justice would be as well done by remitting the parties to their home forum." He further says, that " It is in cases of seamen's wages that the power of the Court is most frequently invoked, and it is well settled that cognizance of a suit will be taken when justice demands that it should be done, as when the voyage is broken up at a port of this country, or

the seaman is compelled to desert on account of cruel treatment, or is entitled to be discharged on account of a deviation." I will advert to some of the authorities referred to by the learned author, as well as to some others. In the case of Taylor *vs.* Carryl, 20 Howard's Rep., 611, the learned Chief Justice of the Supreme Court of the United States says : " It is true, that it is not in every case obligatory upon our Courts of Admiralty to enforce it (a lien) in the case of foreign ships, and the right or duty of doing so is sometimes regulated with particular nations by treaty. But as a general rule, where there is no treaty regulation, and no law of Congress to the contrary, the Admiralty Courts have always enforced the lien where it was given by the law of the State or nation to which the vessel belonged. In this respect the Admiralty Courts act as international Courts, and enforce the lien upon principles of comity. There may be, and sometimes have been, cases in which the Court, under special circumstances, has refused to interfere between the foreign seaman and ship owner ; but that is always a question of sound judicial discretion, and does not affect the jurisdiction of the Court." In Ellison *vs.* ship " Bellona," Bee, 112, the Court say that, " Courts of Admiralty have a general jurisdiction in causes civil and maritime. The case of seamen's wages comes within the description of causes; and this jurisdiction has been uniformly exercised by me, as regards foreigners generally." In Pugh *vs.* Gillau, 1 Calif., 485, where the plaintiff was a British subject, shipped on time, and was discharged by the master some days before the time expired, because the vessel was about to sail on a long voyage, it was held that he could sue in our Courts, though the vessel and captain were English. In the case of Davis *vs.* Leslie, Abbott's Ad. Rep., 131, the Court say : " That the foreign libellant is regarded as not entitled to invoke the power of the Court as matter of absolute right ; yet where the Court is satisfied that justice requires its interposition in his favor, those powers may be, and will be exercised in his behalf." The authorities, both English and American, fully sustain the doctrine of the power of the Admiralty Courts to entertain suits between foreigners, while, at the same time, its exercise is discretionary with the Court. If it is a case of special necessity to prevent a failure of justice,

the duty is imposed to exercise the jurisdiction." (The "Courtenay," Edw. Admiralty R., 239; the "Wilheim Frederick," 1 Hogg Admiralty R., 138; Willendson *vs.* the "Torsomet," 1 Peter's Admiralty R., 196; in the "Jerusalem," 2 Gall. R., 191; the "Aurora," 1 Wheaton, 96.) In the case of Johnson *vs.* Doltan, 1 Cowen, 543, which was an action by a seaman against a master, both foreigners, for assault and battery, committed on shipboard, the Supreme Court of the State of New York sustained the jurisdiction. They say: "Our Courts may take cognizance of torts committed on the high seas on board a foreign vessel; but on principles of comity, as well as to prevent the frequent and serious injuries that would result, they have exercised a sound discretion in entertaining jurisdiction or not, according to circumstances."

In the case of the bark "Havanna," it appeared the ship was owned by a British subject, living in St. John's, New Brunswick, and a creditor of his, who was also a British subject and residing in the same place, instituted a suit against him in the Courts of Massachusetts, and attached the vessel, then lying in the port of Boston, and afterwards recovered judgment and took out an execution, by virtue of which the vessel was sold, and purchased by the execution creditor; whereupon the master libelled the vessel for his wages, by virtue of the Statute of 17 and 18 Victoria, which gives a lien to a master on his ship for his wages; and Judge Sprague, eminent and of long experience in admiralty, ruled that the District Court may, but is not bound to exercise jurisdiction in favor of a British subject against a British vessel, "and that the lien so given may be enforced in the Admiralty Courts of the United States." (22 vol. Law Reporter, 150. The learned Judge adds, that while the Court will exercise jurisdiction for the purposes of justice, it will do so the more readily if no objection is made by the Consul of the nation to which the vessel belongs. This is the rule by which this Court intends to be governed. For the purpose of justice and to prevent its failure, we deem it an imperative duty to exercise jurisdiction between foreigners, responsible and laborious though that duty may be, and it is always a matter of deep regret to the Court to feel impelled by these considerations to entertain jurisdiction, when the representative

of the country to which the party belongs protests against it. In the ordinary cases which arise between masters and seamen of the same nation, very little difficulty is likely to arise, but when they differ in nationality, the question of comity is more difficult to decide, for the representatives of the different nations may entertain different opinions, and make adverse requests, and we must then decide the question whether or not the purposes of justice require the exercise of the jurisdiction. But the libel now under consideration contains allegations of such peculiar injustice and long-continued injury, not more destructive to the health than to the moral sense, that to deny it consideration would be, as we should regard it, a dereliction of duty to the laws of the sea, as well as to the laws of nations and of nature.

Is there a necessity in this case to exercise jurisdiction to prevent a failure of justice? It is not contended that the powers of the Consul are adequate for redress. Then the only remedy is to appeal to the home forum, or to the Courts of this country. If we decline jurisdiction, the only remedy is to follow the vessel to its destination, which is a distant country—after cruising we know not how long, or in what seas—and poor and defenseless the youth arrives at the home port of the vessel and seeks redress in the courts, with what probable success would he seek for his witnesses? Those who have been examined are from different countries and different races, and many have already been discharged from the vessel, and knowing as we do the custom and usage of shipping and discharging men in these voyages of several years duration, and of the uncertain movements of seamen, we regard it as an impossibility ever to procure the testimony at the home tribunal, at least without an amount of expense and labor that this libellant could never command, and therefore it would result in an entire failure of justice. To remit him, young and poor as he undoubtedly is, would be declaring that he must do what we think would be impossible, if not cruelly absurd. It would be a virtual denial of justice. The contingencies are too numerous to make the proposition reasonable, even if he had wealth to prosecute the suit. The defendant is master of a whaleship; when he intends to return to his country does not appear. Many of the material

witnesses for the libellant have been discharged, and entered the service of other ships ; others may do the same before the ship reaches home. When would there be any reasonable probability that the history of the transaction could be proved ?

Parsons says : "If justice would as well be done by remitting the parties to their home forum," it is not incumbent to exercise the jurisdiction. We do not feel it our duty to exercise the jurisdiction at all times in cases even of this character ; but only in cases where from the place of the transaction in these distant seas—from the almost entire impossibility of procuring the testimony, and then not without an. expense far beyond the ability of seamen, there would be an utter failure of justice, if we declined the jurisdiction. Our situation is insular, and far removed from the great marts of commerce and navigation of the Atlantic side of the United States and Europe. Many of the ships in the whaling service are absent from home usually for two or three years, and sometimes longer. Their crews are constantly changing, so that not unfrequently almost entire new crews are shipped at the different ports of the Pacific, for the season to the northern seas, with a stipulation to be discharged at the place of shipment. This is emphatically true at the ports of these islands. The seaman becomes a *quasi* domiciled alien. It would not be strange if in some of those cases the Court should feel impelled by a strong sense of judicial duty to entertain jurisdiction. It is the exercise of a discretion, governed by a legal necessity—not of caprice or will, but stern judicial duty. The seamen who visit these islands are of almost every race and nation, and should we fail to do our duty to these persons, in accordance with the principles and usages which govern Courts of Admiralty in the great maritime States, would not those States have a right by the law of nations to declare to this Government, we have recognized your independence, have received you into the family of nations, we have placed your Sovereign on an equality with the Sovereigns of other nations, and we have a right to demand of you an exercise of judicial power and jurisdiction, which shall save our citizens and subjects who may visit your Kingdom, from a failure of justice ? This is the view we entertain of our judicial duty.

It will be seen how different our situation is from that of

ports on the Atlantic, either of Europe or America. There parties can be remitted to the home forum with comparative ease, a few days or a few weeks only will be spent in making the voyage. But from this Kingdom to any of those ports several months must pass ere the vessels reach their home ports, and in the case of whaleships sometimes years transpire. ·

We hope that the courts of the American and British possessions in the Pacific will afford some relief to the exercise of this jurisdiction, but at present the greater number of ships which visit us have not those possessions for their destination.

We have reasoned thus far on the general principles of Admiralty jurisdiction, without the control of treaty stipulations. The Consul of the United States in his first objection to the exercise of the jurisdiction, says that the parties are American citizens and the ship and owners American. The declaration that the libellant is an American is traversed. He swears that he was born at St. George, one of the Western Islands or Azores, under the dominion of the Kingdom of Portugal, of Portuguese parents residing on said island; that he has never been in the United States except for the space of five months, and is not a citizen of the United States. It is admitted by the counsel for the defendant that the libellant is a native of those islands, and he further states that the Consul in making this declaration only intended to say that his enlistment on an American vessel *imparted* to him *the rights* and privileges of citizenship. The Consul further declares that whatever the alleged cause of action may be, it arose on said vessel, while on the high seas and beyond the jurisdiction of his Majesty's Courts, and by the 21st Article of the Treaty with France is not cognizable in our Courts; and that whatever rights and privileges were granted by said Treaty to France were also granted to the United States, by the parity clause in their Treaty with this Kingdom.

The article in the French treaty referred to, is very clear in its terms in declaring that the laws of the Territory shall obtain in all matters touching the police of the port, the lading and discharging of vessels, the safety of merchandise, property and goods. This is merely declaratory of a principle acknowledged everywhere. But the Consul is charged with the internal order on board, and shall take cognizance of all crimes,

misdemeanors, and other matters of difference in relation to said internal order, provided the contending parties are exclusively French or Hawaiian subjects, and the local authorities shall not interfere, unless by the approval or consent of the Consul, or in cases where the public peace is disturbed. Can any language make this article clearer than that already used? In direct and simple terms it means this, that the local laws shall govern in all matters touching the police of the port and the lading and discharging of vessels, etc.; but so far as any difficulty occurs between the captain, officers and crew, in relation to the internal order of the vessel, the Consul shall take cognizance, unless their conduct disturbs the peace of the port. If the article referred to the internal order on the high seas, could a breach of it there disturb or endanger the public peace and tranquility in any port in the Sandwich Islands? Before the date of this treaty, the jurisdiction of all crimes on the high seas belonged exclusively to the country to which the vessel belonged, and under whose flag she sailed; but when within the jurisdiction of another country, crimes or misdemeanors, although committed in enforcing discipline and order, were cognizable by the Courts of that country, and the accused could not be tried in any other jurisdiction, unless by treaty stipulation. By this treaty we yielded the jurisdiction of *our ports* to this extent, and the jurisdiction of crimes committed on the high seas as well as of marine torts " as a cause of an action for damages," remains as before.

Of the correctness of this construction we entertain not a doubt, but were it not so, it will not be seriously contended that sodomy and unnatural and offensive embraces, made by the Captain on any of his men, is for the purpose of discipline, or is designed to promote the internal order of the vessel; and were the Consul conversant with the testimony given in the case of such unnatural offenses, he would not probably take the ground that they appertained to any matters of difference in relation to the internal order of the vessel. If, then, it is a tort disconnected from and having no relation to the internal order of the vessel, it will not come within the purview of the stipulation of the French treaty, whatever construction may be given to the extent of its application in other respects.

Manuel Enos *v.* N. W. Sowle.

It is said further that all foreigners who enlist for service on American ships become American citizens. If this is so, it does not follow that they become so within the purview of this treaty. This is not the meaning and intent of the treaty. The language is that the contending parties must be exclusively French or Hawaiian subjects. So that if a French master committed a tort on a Hawaiian in attempting to enforce discipline, the jurisdiction of this Court was not surrendered, modified or curtailed, but it remains the same as before the treaty was made. But if the construction of the United States Consul obtains, Hawaiians who ship on a French vessel become subjects of France, and therefore the provisions of the treaty which contemplates that there may be French subjects and Hawaiian subjects in the service of the same vessel, is an impossibility, for on an American vessel everybody is American. If this is the construction given by American law to the act of shipment, of which we refrain from giving an opinion, this high prerogative of citizenship is not given by the laws of France or by the laws of this Kingdom, by the mere act of shipment on their vessels, and therefore the treaty must be construed according to its terms. It was not intended that if a Frenchman was killed on a Hawaiian vessel in a French port by a Hawaiian master, in enforcing discipline, that the Hawaiian should be subject alone to his Consul in that country ; neither was it intended that if a Hawaiian should be killed by a Frenchman in any port of this Kingdom, the French Consul should alone take cognizance of the crime ; on the contrary, this very language was undoubtedly inserted to guard the jurisdiction to this extent, so that if a Hawaiian commit a crime on a French ship, he shall have his trial within this jurisdiction, and the same rights and privilege is mutual. In the meaning and intent of the treaty the libellant is not an American, and therefore the Consul has not exclusive cognizance of the tort alleged to have been perpetrated upon him by the master, even had it arisen from a matter of difference in relation to the internal order, for, in the language of the Treaty, the contending parties must be exclusively French or Hawaiian subjects ; if they are not of the same nationality the jurisdiction remains in full force.

The remaining cause of protest is that it has not been usual for Courts of Admiralty in cases of this kind, and under these circumstances, to entertain jurisdiction without the consent of the representative of the foreign Government to which the parties belong, and more especially after a protest has been entered.    Mr. Benedict, in his Ad. Treatise, p. 159, Sec. 282, says: " There have been attempts in England and in this country to establish an exemption (from jurisdiction) in favor of the seamen of foreign merchant ships.    It has been sometimes placed on the ground of the comity of nations ; sometimes on the fancied ground that a vessel is part of the territory of the nation to which she belongs ; sometimes on the ground that there can be no jurisdiction in such cases without the consent of the Consul, or other diplomatic representative of the foreign nation to which the seaman or the vessel belongs—all of which are fallacious.    There is no such comity of nations—nothing within the territory of a nation is without the jurisdiction, and no officer of a foreign Government can grant or destroy the jurisdiction of our Courts.    Some exemptions are established by the Constitution, some by treaty, and some by the established and immemorial usage of nations, and they do not apply to persons and property engaged in the ordinary pursuits of commerce.    In the present state of international intercourse and commerce, all persons in time of peace have the right to resort to the tribunal of the nation where they may happen to be, for the protection of their rights.    The jurisdiction of the Courts over them is complete, except when it is excluded by treaty."

Judge Betts says, in the case of Bocker *vs.* Kloskgetu, Abbott's Ad. Rep., 408, " In one respect, indeed, the American Courts show a greater favor to seamen, in these cases, than do the Courts of Great Britain, for the former proceed, irrespective of any interference on behalf of the seaman by his Consul or other national representative, whilst the English Courts would seem still to insist that the sanction of such an officer shall be procured unless the nature of the case forbids."    He further says that this precautionary condition is not required in the Courts of the United States, and that jurisdiction will ordinarily be exercised if the voyage is terminated.    In this case the parties belong to different countries, but the country

of the libellant has no representative at this Court. If there was, there would doubtless be as strong a request for the Court to exercise jurisdiction as there is objection by the representative of the American Government.

Mr. Justice Grier, in Gonzales *vs.* Minor, 2 Wallace C. C., 348, says, " When the Court does entertain such cases without the request of the representative of the Government they will require the libellant to exhibit such a case of peculiar hardship, injustice, or injury, likely to be suffered without such interference, as would raise the presumption of a request, because it is in fact conferring a favor on such foreign State."

In the case of the " Golubchuck," 1 W. Rob., 143, the master appeared under protest, stating that the suit had been commenced without the consent of the Russian Consul, or any other accredited agent of that Government in the country, Dr. Lushington held that the Court must possess original jurisdiction over the subject matter, or it could hold none at all, for the consent of a foreign consul or minister never could confer jurisdiction upon a British court of judicature. In Hay *vs.* Brig "Bloomer," U. S. D. C. Mass., March, 1859, Judge Sprague said, " The usual course in the case of a libel by a foreign seaman against his vessel, is to direct the clerk to inform the consul of the Government of the pendency of the suit, that he may take such notice of it as he thinks proper, and unless there were strong circumstances in the case, the Court would not proceed *in rem* against a foreign vessel, without the assent of the commercial representative here of the foreign Government of the country where she belonged."

Mr. Justice Curtiss, of the Supreme Court of the United States, overruled a protest of an English Consul to the jurisdiction of the Court, in a case where the libellant, an American citizen, had been hired in Boston for a voyage in an English registered vessel, with an English master, from Boston to St. Jago and back to a port in the United States. The voyage was performed, and the men discharged in Boston. An action was commenced in a cause of personal damage, and the English Consul filed a protest to the jurisdiction, setting forth that the vessel was a British vessel and the commander a British subject ; also, " that an investigation of some of the alleged causes of

damage must call in question official acts and conduct of a British functionary in regard to British subjects, for which he is responsible only to his Government."

It appears from all the authorities that courts will insist, in some cases, on the approval of the foreign representative before they will entertain jurisdiction, and in other cases direct notice to be given him of the pendency of the suit, unless it is apparent from the statement of the parties that he is cognizant of the suit pending, or unless the defendant acquiesces in or desires the exercise of jurisdiction. In cases where it is apparent from the allegations in the libel that the Consul has not the power to give the party redress, it has not been deemed necessary to insist on his approval or consent, or when it is manifestly necessary to prevent a failure of justice. In this case that effect would be inevitable for reasons already given. If the allegations in the libel are true, the contract of hiring is dissolved by the wrongful act of the master. Should not the party have an opportunity of seeking for redress before an Admiralty Court here, or should he be put on board the vessel at the risk of being subjected to the same inhuman wrongs and injuries many months more? Is it a usual case? Is it not more imperative in its claims for jurisdiction than any other case which can be presented, for there is the alleged wrong and injury unredressed for the past, and exposure to the same wrong and injury for the future? For illustration, it may be well to reverse the case. Suppose there was an American youth on board a Portuguese vessel, and he filed his libel making the same allegations, and the Court should say to him we can't hear your case, you must seek your remedy at the home forum, which is Portugal; therefore go aboard of your vessel, although you may be subjected to a repetition of the same disgusting life, and when you arrive in Portugal, penniless and friendless, you can prosecute your case there. The responsibility of exercising the jurisdiction rests finally upon the Court. It must be apparent that all courts would much prefer to avoid the responsibility and labor, if they could remit the parties to their home forum, when there is a reasonable probability that the case can be fully presented there, and that the accused party would not be left with the facilities to perpetrate again the same acts as those complained of.

Manuel Enos *v.* N. W. Sowle.

In this case the Court regards it an imperative judicial duty to entertain the jurisdiction, and therefore the protest of the Consul is overruled.

———

MANUEL ENOS (IGNACIO) *vs.* NATHANIEL W. SOWLE.

This cause having been submitted by agreement to the full Court in the first instance, ROBERTSON J., after the above decision on the question of jurisdiction had been given by the Chief Justice, delivered the following judgment on the merits :

The evidence introduced in support of the allegations in the libel is very lengthy, and much of it of a character which renders it inexpedient for us to recapitulate it, even briefly, in giving a decision which must be made public. But it is not necessary that we should do so, for the testimony is quite fresh in the recollection of those who heard it, and it has been referred to in detail and commented upon in the fullest manner by the learned counsel on both sides, who have argued the case with great ability. The testimony not having been given in the form of depositions, but *viva voce*, in presence of the Court, we have had the advantage of watching the demeanor and appearance of the several witnesses on the stand, and of hearing their statements as given in their own words, an advantage which is of great value in a case of this nature. The libellant's witnesses have been subjected to a searching cross-examination on the part of counsel, and several of them have been interrogated by the Court, as to points calculated to test their credibility. A small amount of testimony has been presented on behalf of the respondent, but it is very meagre and of little weight, while the respondent himself has been content with filing his written answer, denying in general terms the allegations of the libel, and has not availed himself of the opportunity freely offered him to come upon the stand and contradict or explain, if he could, the testimony of any or all of the witnesses produced against him.

After mature consideration of the evidence before us, and weighing all the facts and circumstances of the case, we are of the opinion that the theory of defense so ingeniously urged by counsel, that this is a plot or conspiracy gotten up for the pur-

pose of ruining the respondent, is without foundation in fact; and we are driven to the unwelcome conclusion that the allegations of the libel are clearly proved. We have no reason to doubt that the libellant, who is still a youth of tender years and fragile frame, has at various times, since he left New Bedford on board of the "Montreal," three years ago, been subjected to treatment the most foul and unnatural, at the hands of the respondent. A more glaring violation of the duty which the respondent owed to the libellant cannot be imagined. A. grosser instance of oppression and persistent abuse never came to our cognizance; and the annals of criminal jurisprudence scarce contain a case which, in the exhibition of moral depravity surpasses the present.

It becomes our duty, therefore, as a Court exercising a beneficent jurisdiction, vested in us by the Constitution of this Kingdom, and by the general maritime law of the world, to declare the contract entered into by the libellant to serve on board of the ship "Montreal," as no longer binding upon him; and to mete out to the respondent such a measure of justice as shall secure a reasonable amount of pecuniary reparation to the libellant for the injury he has sustained, and serve to mark our reprobation of the respondent's conduct, which we now do by pronouncing in favor of the libellant for the sum of two thousand five hundred dollars damages, and the costs of suit. Let decree be entered accordingly.

Messrs. Harris and Montgomery for the libellant.

Mr. Bates for the respondent.