## THE SERAPIS.[1]

### SALMON v. THE SERAPIS et al.

*(District Court, S. D. New York. January 9, 1889.)*

1. SHIPPING—BOTTOMRY—MASTER'S DRAFT—PERSONAL LIABILITY—PARTIES—ADMIRALTY RULE 18.

   A master's draft was drawn in the following form: "On arrival at port of destination I promise and bind myself to pay, * * * for the payment of which I hereby pledge my vessel. This is my obligation, which settles definitely every accounts with the charterer, and I have signed this in settlement and fulfillment of the obligations contracted by my owners, M. Bros. & Co., with the charter-party, and I give this bill in their name, account, and order, and acting as their empowered representative. Any other obligation or draft drawn by me to be secondary to this. [Signed] G. D., Master of steam-ship S." In an action brought by an indorsee of the draft against the ship and master upon the draft only, *held*, that the draft did not purport to bind the master personally, and that the joinder of both was improper under admiralty rule 18.

2. SAME—NEGOTIABILITY.

   Such an instrument is only *quasi* negotiable, and is subject to all equities as respects the ship. When given in settlement of differences of freight, without authority, it creates no lien on the ship; and, as it does not purport to bind the master personally, no suit against him lies on the instrument itself, but only against him "as a wrong-doer," under rule 18, upon his false representation or implied warranty; and where the payee has knowledge of all the facts, and the indorsee easy means of knowledge *semble*, proof of his *bona fide* purchase of the draft, without notice of equities, is requisite to enable him to set up any estoppels against the master appearing on the draft itself.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

3. SAME—CHARTER-PARTY—CESSER CLAUSE—SETTLEMENT—ERRORS.

The cesser of liability clause in a charter, "all claims on charterer to cease" after settlement between the master and the charterer, will not prevent the correction of errors in the settlement itself.

4. SAME—COMPUTATION OF FREIGHTS—FOREIGN WEIGHTS—LEX SOLUTIONIS.

The Italian mode of turning cantars into English pounds being different from the New York mode, and the bill of lading making the freight payable in New York, on the number of "cwt. delivered," *held*, the rule in force here must govern.

5. ADMIRALTY—PRACTICE—ANSWERS TO INTERROGATORIES—EVIDENCE.

Answers to interrogatories annexed to the pleadings stand, as evidence, like the pleadings only. What is admitted, needs no further proof; but as respects matters that still remain at issue, answers to interrogatories are not affirmative evidence in favor of the party making them.

6. SAME—COSTS—CLERK'S AND MARSHAL'S FEES—TENDER.

Upon deposit of money as a tender in the registry of the court, the clerk's and marshal's statutory fees payable thereon must be also added and paid by the depositor, in order to make the tender good, if the tender and deposit are first made after suit brought; otherwise, if the deposit is only in support of a sufficient legal tender made before suit brought. In the former case the tender will be held available only for the deposit less the clerk's and marshal's charges.

In Admiralty. Libel by an indorsee of a master's draft against the vessel and the master personally to enforce payment of the draft.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for libelants.

*E. B. Converse*, for respondents.

BROWN, J. The libel in this case was filed against the British steamship Serapis, and George Dobson, her master, to recover £545.18.7, the amount of an obligation drawn by the master at Palermo, February 11, 1888, payable to the order of the charterer, Pietro Tassi, on arrival of the steamer at New York, pledging the ship for payment, and indorsed to the libelant. The obligation was a brief form of bottomry, given in settlement of differences between the charter money owing by Tassi for the hire of the vessel and the freight to be collected by the steamer upon the bills of lading on arrival at New York, for goods shipped on board at Palermo, the last port of loading. The form of the master's obligation, and the provisions of the charter, so far as they relate to this subject, are identical with those in the recent case of *The Lykus*, 36 Fed. Rep. 919, except as to names, dates, and amounts. Before and on arrival of the steamer at New York it was found that various errors had been made in fixing the amount of the bill, to-wit:

| | | |
|---|---|---|
| (1) Error in addition by the master, | | £100. 0.0 |
| (2) Erroneous allowance of insurance, | | 9.12.0 |
| (3) Difference between bill of lading given by the master to the charterer for fruit, and certain sub-bills of lading, issued by the charterer to the owners of the fruit, | | 19. 9.5 |
| (4) Shortage of freight collectible on 5,200 cantars of ore, through the different modes of converting cantars into pounds at Palermo and New York, | | 11.11.7 |
| (5) One bill of lading omitted, | | 12. 8.6 |
| Total, | | £153. 1.6 |

The first four items would by so much reduce the ship's debt; the last would increase it. The third item (excepting 18/4, accounted for) was returned by Tassi to the defendants by his draft, which was received by them, but has not been paid, and was offered to be returned for the first time upon the trial. If all the above corrections were made, the bill would be reduced by £128.4.5, leaving due £417.14.2, amounting to $2,037.30. This sum, with interest and costs, the owners of the vessel paid into court soon after the commencement of the suit. The litigation is as to the residue only of £128.4.5.

1. As against the ship, the libelant cannot recover, because, as in the case of *The Lykus, supra,* the master had no authority, either under the maritime law or under the terms of the charter, to execute bottomry, or any express hypothecation of the ship, for differences in freights in favor of the charterer, or for his advances of charter money. As regards any express lien, the obligation is, therefore, invalid; and if any implied lien arises against the ship for the fulfillment of her charter obligation to pay any differences in freight to the charterer, such an implied lien does not extend beyond what the ship actually owed. The indorsee stands in this regard in no better position than the payee; so that any mistakes in ascertaining the amount owing by the ship must be corrected in the ship's favor. This is not contested in this case.

Although by the Codes of France (section 313) and of Italy (section 592) bottomry bills payable to order have the full qualities of negotiable paper, saving defects of assent or authority, (3 Valroger, Droit Mar. § 1013; 5 Desjardins, Droit Mar. § 1148, p. 187; 2 Laurin, Cresp. 251, note 40,) I understand our law to be otherwise. Such instruments, being payable only on a condition, are not fully negotiable like promissory notes and bills of exchange; but, like bills of lading, only *quasi* negotiable; and, except in cases subject to the principles of equitable estoppel, the indorsee takes only the payee's rights; *i. e.*, subject to any equities affecting the obligation itself, though not, perhaps, subject to wholly independent offsets available against the payee, (*Shaw* v. *Railroad Co.*, 101 U. S. 557;) and any errors, imposition, or sharp practice in bottomry obligations are freely corrected by our courts of admiralty. *Nunez* v. *Dautel,* 19 Wall. 560; *The Virgin,* 8 Pet. 538; *The Woodland,* 104 U. S. 180; *The Catherine,* 3 Wm. Rob. 1, 5; *The Osmanli,* Id. 198; *The Prince of Saxe-Cobourg,* 3 Hagg. Adm. 387, 394, affirmed, 3 Moore, P. C. 1, 10; *The Zodiac,* 1 Hagg. Adm. 320, 327, 332; *The Cognac,* 2 Hagg. Adm. 378; *The Packet,* 3 Mason, 260; *Coolidge* v. *Ruggles,* 15 Mass. 387; *The Archer,* 15 Fed. Rep. 276, 282, 23 Fed. Rep. 352; *The Lykus, supra.* See, also, German Code, art. 687; Wendt, Mar. Leg. (3d Ed.) 739; The Netherlands Code, § 573.

2. The cesser of liability clause in the charter, "after such settlement all claims on charterers to cease," does not prevent the correction of errors in the settlement itself, as between the ship and Tassi—(1) Because the parties are presumed to have meant by that clause a true and proper settlement, not a false or erroneous one. On an account stated, upon a settlement, errors or mistakes, clearly proved, are corrected as of course.

*Perkins* v. *Hart*, 11 Wheat, 256; *Wiggins* v. *Burkham*, 10 Wall. 129. (2) Because the parties have treated the settlement as provisional only, as in *Eisenhauer* v. *De Belaunzaran*, 26 Fed. Rep. 784, 790. Both sides, before this litigation began, made proffers for the proper correction of some of these errors. (3) Because the defense here does not come within the letter of the cesser clause as a "claim made upon the charterer." It is a resistance against payment to the charterer, or his indorsee, of a larger sum than was due them. The charter does not say that the captain's "settlement" shall be final and conclusive as to the amount owing by the ship, or as to the amount of the charterer's claim on the ship, so as to preclude any subsequent correction of mistakes. I do not think any such thing was intended by the cesser clause. The common practice under it confirms this view. If the parties meant that such settlement should be conclusive for all purposes on ship and owners, that should at least have been stated. Such a construction is too prejudicial to justice, and too liable to abuse, to be supplied by implication merely. The history of such clauses in charter-parties, moreover, shows that they were originally designed to relieve charterers or agents, abroad, from future responsibilities for the voyage; as in the collection of freights, or the detention of the ship, over neither of which could they exercise any control or supervision. Macl. Shipp. 356–359; *Christoffersen* v. *Hansen*, L. R. 7 Q. B. 509; *French* v. *Gerber*, L. R. 1 C. P. Div. 737, 744, L. R. 2 C. P. Div. 247, 253.

3. The item of £11.11.7, shortage on freight, arises through the different modes of turning Italian cantars into English pounds. The bill of lading made the freight payable "on arrival in New York at the rate of 11/9 sterling per ton of 20 cwt. delivered in full." In the "settlement" at Palermo, the cantars, by the Italian reckoning, amounted to 1,371 tons; by the New York mode of reckoning, the same number of cantars made only 1,352 tons. But as the freight was payable in New York on the number of "cwts. delivered," the rule of computation in force here must govern.

All the corrections claimed must therefore have been allowed, if this action had been brought by Tassi; and the libelant, as indorsee, can claim no greater lien against the ship than Tassi could have claimed.

4. As against the master, it is contended that he is equitably estopped from disputing his liability for the full amount of the bill to a *bona fide* indorsee, by the false representation that the bill was given "for necessary last disbursements, as well as for differences in freight," and that he had "signed it in settlement and fulfillment of the obligations contracted by his owners, McIntyre Bros. & Co., London, with the charterers." But if this instrument is not the personal obligation of the master, the proper remedy for the false representation, or implied warranty of authority, would be by an action on the case for damages for such false representation and warranty; not like this, upon the bill itself. 1 Pars. Cont. (7th Ed.) 69; *Richardson* v. *Williamson*, L. R. 6 Q. B. 276, 278; *Simmons* v. *More*, 100 N. Y. 140, 2 N. E. Rep. 640; *Baltzen* v. *Nicolay*, 53 N. Y. 467. Such an action could not properly be conjoined with a

suit *in rem* against the ship.    Admiralty rule 18.    But, dismissing the libel as against the ship, the suit might be retained against the master on the allegations of the libel, if this obligation purports to bind him; and, in that case, he would be concluded by any estoppels that might be found on the face of the paper.

The language of the bill is as follows:

"On arrival at the port of destination I promise and bind myself to pay to the order of Pietro Tassi, £545.18.7 in cash, or approved bankers' demand bills on London, * * * for the payment of which I hereby pledge my vessel. This is my obligation, which settles definitely every [all] accounts with the charterer, and I have signed this in settlement and fulfillment of the obligations contracted by my owners, McIntyre Bros. & Co., with the charter-party, and I give this bill on their name, account, and order, and acting as their empowered representative. Any other obligation or draft by me drawn to be secondary to this.                    GEORGE DOBSON, Master S. S. Serapis."

The bill is a printed form with names, dates, and amounts filled in. Taking this language all together, I do not think it was designed or understood to create any personal obligation of the master. Aside from the considerations applicable to it as a bottomry obligation, and regarding it as an ordinary commercial contract, signed by an agent, though the cases bearing on the question are not free from some conflict, the weight of authority, I think, is to the effect that, where the instrument is made by a known agent, is signed in that capacity only, discloses the principal, and clearly indicates that it is given in the principal's business, and on his account, it will be construed as the obligation of the principal, and not of the agent.    The use of such words as "I promise," or "we bind ourselves," etc., are construed as used in the official or representative character only, not binding the agent personally.    *Falk* v. *Moebs*, 127 U. S. 597, 8 Sup. Ct. Rep. 1319; *Smith* v. *Morse*, 9 Wall. 76, 82; *Metcalf* v. *Williams*, 104 U. S. 93, 97; *Rice* v. *Gove*, 22 Pick. 158; *Goodenough* v. *Thayer*, 132 Mass. 152; *Alexander* v. *Sizer*, L. R. 4 Exch. 102; *Gadd* v. *Houghten*, L. R. 1 Exch. Div. 361; *Lindus* v. *Melrose*, 2 Hurl. & N. 293; Story, Ag. §§ 154, 271; 1 Pars. Cont. (7th Ed.) *57, note; 1 Pars. Notes & B. 98, 99; Evans, Prin. & Ag. (2d Ed.) 226, 246, 248.

This obligation states expressly that it was given "on account and by order of the owners," and in the master's "representative capacity."    No stronger declaration of its representative character could be made.    The charter uses similar language: "Differences of freights to be settled, if in captain's favor, by cash; if in charterer's favor, by captain's bill; captain having a lien on cargo for all freight," etc.    Manifestly the cash to be paid to the captain was not to be his individual property; nor his bill to be his individual obligation; nor the lien to be for his own benefit.    His representative capacity is alone referred to.

Emerigon treats of this point with entire clearness, Contrats a la Grosse, c. 4, § 12.    Putting a case from the Roman law he says:

"As agent of Octavius Felix, I have received of you one thousand crowns, which I will repay you within a certain time. I am not bound in my own person, because I have signed this obligation in my capacity as agent. * * *

In a word, the agent who in the obligation designates his capacity, of whatever kind it be, * * * is not himself bound. * * * But the agent who pledges his own faith to another cannot be relieved from his contract."

As to the captain's personal liability on a bottomry obligation, he says:

"A distinction is to be made. If in the contract of bottomry the captain has bound his own goods and his person (of which I have seen a thousand examples) he is personally held. But if he has contracted only in the quality of the captain, the lenders * * * will be limited to their action *in rem*."

The forms long in use show the two kinds of bottomry contract indicated by Emerigon,—the one, whereby the master simply "binds himself, his heirs," etc.; the other, whereby he "binds himself, his heirs," etc., "* * * and his goods and chattels," or his "lands, tenements, goods, and chattels." Abb. Shipp. App. form 2; Macl. Shipp. pp. 947–949; *The J. Goodhue*, 1 Swab. 524, 527. The former words are but the formal language constituting a representative obligation only, for which the ship alone is liable. *The Virgin*, 8 Pet. 554. This instrument is of that class. In *The J. Goodhue*, *supra*, the bond was of the latter class, pledging the master's "lands, tenements, goods, and chattels."

The eighteenth supreme court rule in admiralty, in declaring that "in all suits on [valid] bottomry bonds the suit shall be *in rem* only," seems to determine our law on this point in the master's favor, at least on all ordinary bottomry instruments; so that, unless the master has pledged his own property, or pledged his own credit by some unusual language, he is not personally liable; and if he has pledged his own property, then that is part of the "property hypothecated," and falls within the eighteenth rule. Other phases of this question have been forcibly presented by BENEDICT, J., in the case of *The Irma*, 6 Ben. 1, and need not be repeated here. The language of this instrument has less indication of a pledge of the master's personal credit than the ordinary forms of simple bottomry that contain no pledge of the master's goods. Thus, the ordinary forms often state, as in *Simonds* v. *Hodgson*, 3 Barn. & Adol. 50, that the master "binds himself, his heirs, administrators and assigns," which latter words are absent in the present case; yet, with reference to such a bottomry, Lord TENTERDEN, in the case cited, says:

"It cannot be supposed that the lenders looked to him [master] personally, or to his personal means; nor that he intended to pledge himself personally and absolutely for the payment, without regard to the means with which he might be furnished by the ship and her freight."

As this bottomry obligation, therefore, does not bind the master personally, any suit seeking to charge him for a false representation, or for want of authority in executing it, must be upon a libel against him as a "wrong-doer," under rule 18, with the appropriate allegations; none of which exist in the present libel. Such a libel could not be sustained in Tassi's favor, since he had notice of all the facts. He knew that the amount was more than was due to him, and that the error of £100 was a mistake by the master. To negotiate the draft for its full amount, without notice given of the error, would be none the less a fraud upon

the ship and her owners, even if this, the largest, mistake of £100 was caused, as the libelant claims, by the master's obstinate refusal to listen to the suggestion of Tassi's representative that there was error in the amount, though the master asserts the contrary.  As fraud is not presumed, it might be inferred that the libelant, the transferee, was notified of the mistake, in the absence of any evidence to the contrary.  Strict proof should, therefore, be required of what occurred upon the transfer; what inquiries, if any, were made; and what knowledge or notice was given to the libelant, before admitting such an equitable estoppel as is claimed.

The libelant's answers to the interrogatories do not cover this point. Such answers to interrogatories propounded at the close of the pleading under admiralty rules 23 and 27, are not strictly evidence in the cause, in any different sense than that in which the pleadings are evidence. *Andrews* v. *Wall*, 3 How. 568.  Though sworn to, they are not a "deposition" for which costs can be taxed under Rev. St. § 824.  Such answers to interrogatories are designed rather as compulsory amplifications of the pleadings on the specific subjects propounded in the interrogatories, so as to dispense with the taking of proofs, or evidence proper, on the facts that may be admitted.  When the interrogatories are propounded by the libel, the replies usually make part of the answer itself. Dunl. Adm. Pr. 201.  It is immaterial whether they are answered as a part of a pleading or separately.  As evidence, they stand like the pleadings only.  They are parts of the record, and may, like the pleadings, be referred to by either party.  What is admitted, needs no further proof; but as respects matters which still remain at issue, such answers are not affirmative proof in favor of the party making them.  Williams & B. Adm. Prac. (2d Ed.) 410.

The libelant did not answer the second interrogatory as to whether he bought or discounted the draft absolutely, or subject to its collection at New York; he says:

"I bought the draft because it was signed by the captain, pledging the ship for its payment, which I considered a true guaranty, inasmuch as charterer indorsed to me the relative policy of insurance for the case of the ship's loss."

He further states that the transaction was verbal, and that he has "no claim to make against Tassi."  Neither in the libel, nor in the answers to the interrogatories, is there an indication of any reliance on the master's credit.  The language just quoted indicates that the bill was taken upon the credit of the vessel only.  Considering that the bill makes express reference to the charter, and that neither the charter, nor the general maritime law, nor the Italian law, authorize bottomry of the ship for debts of this kind, the libelant was specially put upon inquiry as to the facts and the terms of the charter, which were easily procurable from Tassi; and it is doubtful whether any equitable estoppel could in this case arise.  See *The Prince of Saxe-Cobourg*, 3 Moore, P. C. 1, 11.  That question, however, cannot be determined in this action.

The libelant may take a decree for the amount deposited in court, without further costs to either party.

(January 21, 1889.,

Upon the settlement of the decree a question arises as to which party shall bear the charge of 1 per cent. on the amount tendered and paid into court, which section 828 of Rev. St. U. S. makes payable to the clerk for "receiving, keeping, and paying out money," as well as the marshal's percentage on the same.

In the case of *Upton* v. *Triblecock*, 4 Dill. 232, note, Mr. Justice MILLER held that where a party is adjudged to pay money, and, instead of paying it to the other party or his attorney, elects to pay it into court, he must pay in addition the clerk's statutory charge. In *Kitchen* v. *Woodfin*, 1 Hughes, 340, the ruling was similar as to the clerk's fees upon money collected on execution and paid into the registry of the court.

When a full tender is made before suit brought, the defendant, by rule 72 of this court, in order to avail himself of the tender in discharge of costs, must, "before answer, plea, or claim filed," deposit in the registry "the same tender." He need deposit no more; for if the original tender was sufficient, all subsequent costs and charges should be borne by the libelant, and the libelant therefore recovers only the deposit, less the clerk's charges thereon.

If the tender is first made *after* suit brought, by deposit with the clerk under rule 73, then the defendant elects to make use of the registry of the court to avoid subsequent costs, and he must therefore deposit, in addition to the amount due to the libelant, the clerk's and marshal's statutory percentage thereon. The clerk is entitled to deduct from the fund deposited these statutory fees; so that, in effect, the amount inuring to the credit of the libelant as a tender to the defendant, is the amount deposited, less these statutory charges. It is the same with any other payment to the clerk, or deposit under the order or decree of the court. See *The Georgeanna*, 31 Fed. Rep. 405. This tender was first made after suit brought; and the clerk's percentage, therefore, must fall upon the defendant.

It is the same with executions. Under rule 157, the marshal being required to pay into the registry all moneys coming to his hands by any process of the court, he should be directed upon execution to collect of the judgment debtor the clerk's percentage, as well as his own fees. The debtor may avoid both these charges by payment of the judgment to the proctors before the execution issues. His failure to do so is an election to leave the collection of the judgment to legal process; and this properly charges upon him all the fees consequent on that process.