MOORE *et al. v.* THE ROBILANT.

*(Circuit Court, E. D. Louisiana.  April, 1890.)*

1. CHARTER-PARTY—CONSTRUCTION—LIEN FOR SUPPLIES.
    When a charter-party provides that, for supplies furnished on the order of the
    master, the charterers shall have a draft or obligation of the master and a lien on
    the vessel, and necessary supplies are furnished by the charterers on the order of
    the master and the credit of the vessel, the charterers have a lien on the vessel,
    both under the general maritime law and the contract of charter.
2. SAME—ACTION IN PERSONAM—WAIVER.
    The institution of an action *in personam* against the agents of the vessel is not
    a judicial concession that the vessel is without liability.
3. SAME—PLEADING—EVIDENCE.
    Admiralty rule 51 provides that, when the answer alleges new facts, these shall
    be considered as denied, and no replication shall be allowed. Where the obligation
    sued on was entered into by the master, and the answer alleges that it is governed
    by the laws of England because payable there, that thereunder it is void unless
    specially authorized by the owners, and that "no such authority was obtained, or
    even asked for," claimants cannot object to the introduction of the charter-party
    to prove such authorization, even though no such issue was raised by the libel.

In Admiralty.  Appeal from district court.

*E. W. Huntington,* for libelants.

*James McConnell,* for claimants.

PARDEE, J.  The libelants, in their libel and amended libel, propound
as follows:

"The libelant is the owner by purchase of an obligation for eight hundred
and two pounds two shillings and eight pence executed by the master of said
steam-ship, she being then in a foreign port and destined on a voyage to Liv-
erpool, dated at Newport News, June 6, 1888, and payable to the order of
Barber & Co., five days after the arrival of said vessel at the port of Liver-
pool, and by said firm indorsed in blank, as by said obligation marked 'Ex-
hibit A,' filed herewith as part of his libel; that the said vessel, having, by
means of the disbursements mentioned in said obligations, been fitted for sea,
proceeded to the port of Liverpool, where she arrived in safety; that the
aforesaid sum has not been paid, in whole or in part, to the libelant, or to
any one else empowered to receive the same in his behalf, although payment
has often been requested; that the said steam-ship is lying within the port of
New Orleans, La., and within the jurisdiction of this honorable court; that
the money advanced on the obligation sued on was absolutely necessary for
the vessel to prosecute her voyage, and the master had no other means of
raising funds for that purpose."

Exhibit A, attached to the libel, is as follows:

"Disbursements.  (Form A.)

£.   s.   d.
"803—2—8.                                                    June 6, 1888.

"Five days after arrival, or upon collection of the freight, if sooner made,
of the Italian S. S. Robilant, under my command, at the port of Liverpool, or
any other place at which her voyage may terminate, I promise to pay to the
order of Barber & Co., the sum of 803 pounds 2 8, in approved bankers' de-
mand bills on London, for value received, for necessary disbursements owed
by my vessel at this port, for the payment of which I hereby pledge my vessel
and her freight, and I hereby assign to the legal holder of this obligation all

my lien and claim against freight, vessel, and owners, with power to take, in my name, any and all necessary steps to enforce the same: and my consignees at the port of discharge are hereby instructed to pay this obligation, and to deduct the amount thereof from the freight due said vessel. In case of non-payment, the holder shall also be entitled to the benefit of all liens, in law, equity, or admiralty, which the master or owners of the vessel may be entitled to, against any part of the cargo or its owners, for freight, compress, or other charges on cargo paid by the vessel or master at the port of loading; this claim to have priority of payment over all others that may be presented against the said freight and vessel. My vessel is now lying at the port of Newport News, loaded with gen'l cargo, and ready to sail for Liverpool.

"Signed in triplicate; one being accomplished, the others to stand void.

[Signed] "F. FELUGA, Master of the S. S. Robilant."

On the reverse side of the said Exhibit A: "[Signed] BARBER & Co." The claimant excepts to the said libel:

"(1) That the said libel upon its face presents no valid or legal cause of action against the said steam-ship. (2) That upon the face of the libel and exhibits therewith filed, as part thereof, no sufficient legal showing is made to justify or sustain the proceedings and seizure *in rem* made herein against the said steam-ship, and no authority therefor under the law and practice in this honorable court in admiralty."

These exceptions being overruled, or rather disposed of by an amendment to the libel, claimant answered the said libel and amended libel by reserving the exceptions herein filed, and not waiving the same. He denies that libelants are the owners of the obligation sued on, or have any legal title thereto. Denies that it was by means of the disbursements mentioned in said obligation that the said vessel was fitted for sea. Denies that the money advanced on the obligation was absolutely necessary for the vessel to prosecute her voyage, and that the master had no other means of raising funds for that purpose. Further answering, says:

"That on the face of the pleadings there is no sufficient cause of action against said steam-ship to authorize seizure *in rem;* that, the obligation sued on being payable in England, the rights and obligations thereto are governed by the laws of the kingdom of Great Britain, according to which a special authorization from the owners to the master of said ship was necessary before such an obligation could be legally made or issued; that no such authorization was ever obtained, or even asked for, although the respondent, owner of said steam-ship, resided then, as now, in England, and could have been communicated with by cable or mail; that the obligation sued on is not negotiable, and is sued on by libelants to enable Barber & Company to escape the offset of a counter-claim for damages; that a joint action was instituted in July, 1888, in Liverpool, England, by libelants and Barber & Company against Allen Bros. & Company and F. Feluga, declaring them to be the real debtors of said obligation, and thereby respondent, as owner of said steam-ship, was judicially conceded to be without liability for said obligation."

The proof shows Allen Bros., agents for owners of the Robilant, chartered the Robilant, May 2, 1888, then at New York, to Messrs. Barber & Co., of New York, for a voyage from the port of Newport News, Va., to Liverpool, for a general cargo of lawful merchandise. The charter provided, among other things, as follows:

"Cash for ship's ordinary disbursements at the port of loading to be advanced to the master by charterers, if desired by the captain, subject to two and a half per cent. commission thereon, and cost of insurance; but the captain to give the usual draft, payable five days after arrival at the port of discharge, for amount of such disbursements, to the order of the charterers, or of any other parties advancing the said money; and the agents, with the consent of the owners, do hereby authorize the captain to sign such draft, and said disbursements and said draft shall be a lien against the vessel and freight, taking precedence against all other claims, except the one for difference in freight."

The proof further shows that, while at Newport News, the cargo of the Robilant was damaged by fire, necessitating unloading and repairing to some extent; that, for the costs and disbursements on account of this fire, Barber & Co. advanced the sum of $1,669.91, at the request of the captain of the Robilant; that, under the charter-party, Barber & Co. advanced, for the benefit of the ship, and to pay its ordinary expenses and repairs, consul fees, and pilotage, etc., in order to fit it for the voyage, including commissions, the sum of $2,180.44, and that Barber & Co. presented these accounts to the master, including items of $4,090.45, claims for vacant spaces, detention of cattle, and other items; that thereupon settlement was had between Barber & Co. and the master, with the help of experts, resulting in the following agreement:

"NEWPORT NEWS, 6th June, 1888.

"With reference to settlement of account due Barber & Company, charterers of the S. S. Robilant, for disbursements and difference in freight, as per charter-party, in which certain items mentioned below are claimed by Barber & Company as due to them, and are disputed by the captain of said S. S. Robilant, it is hereby agreed, in order to avoid detention, that draft shall be signed for amount of account rendered, less said items; and that the said items shall be discussed hereafter, and shall be subject to settlement by arbitration, or otherwise, as may be arranged between Barber & Company and owners' agents. This agreement is without prejudice to the rights of either party. Items referred to: Towages incident to efforts to correct steamer's list, two hundred dollars, ($200.00;) breaking out and restowing cargo, three hundred and sixty and forty-five hundredths dollars, ($360.45;) claim for vacant spaces not available in consequence of the list, eight hundred and fifty dollars, ($850.00;) detention of cattle and expense retaining part of same, estimated, twenty-six hundred dollars, ($2,600.00;) surveyors from New York, eighty dollars, ($80.00.)

[Signed]        "BARBER & CO.                "F. FELUGA."

And thereupon the draft herein sued upon, for the undisputed items of Barber & Co.'s account, was executed and delivered to Barber & Co. The proof further shows that, within three days thereafter, said draft was sold to libelants herein at nearly its face value, for cash, and that the disbursements made by Barber & Co., which were included in the above draft, were necessary and proper for the ship, and were furnished at the request of the master. It further appears in evidence that a suit was instituted in July, 1888, in Liverpool, England, as claimed in the respondents' answer, but that said suit has been discontinued.

On this state of the pleadings and evidence, it is difficult to see why libelants are not entitled to a decree. The libel claims a lien for the

amount of a draft or obligation, in terms granting a lien, given by the master of the Robilant for necessary supplies to the vessel furnished on his order in a foreign port. "Where a maritime lien attaches to a vessel, and her owner gives a draft for the debt, the draft in terms recognizing, confirming, and continuing the lien, the assignee of the draft and claim can enforce the lien against the vessel." *The Pride of America,* 19 Fed. Rep. 607. This is fully sustained by *The Woodland,* 104 U. S. 180. See, also, *The Serapis,* 37 Fed. Rep. 436. The proof shows that the supplies were necessary; were furnished in a foreign portion of the order of the master, and on the credit of the ship; further, that they furnished by the charterers under a charter-party specifically providing that, for supplies furnished on the order of the master, the charterers should have a draft or obligation of the master, with the lien on the vessel; so that, for the supplies in this case, there was a lien on the vessel both under the general maritime law and under the contract of charter. For the maritime lien, see *The Grapeshot,* 9 Wall. 129; *The Lulu,* 10 Wall. 192; *The Patapsco,* 13 Wall. 329; *The Souder,* 17 Wall. 666. In argument, it is contended that no lien resulted for the supplies furnished, because the furnishers were the general agents of the ship, and are therefore presumed to have advanced on the credit of the owners, and not on the credit of the ship. The evidence negatives the fact claimed, and completely rebuts the presumption supposed to follow.

The exceptions to the libel, as amended, are not well taken. The grounds of defense put forward in the answer are either not tenable or not sustained by the evidence. If it is conceded that the obligation sued on, being payable in England, the rights and obligations thereto are governed by the laws of the kingdom of Great Britain, according to which a special authorization from the owners to the master was necessary before such an obligation could be legally made and issued, still it can have no effect in this case, because the authority of the owners to give the draft in question was specially granted by the charter-party, and the action of the master was ratified by the owner claiming part of supplies in general average. As a matter of law, the lien for necessary supplies furnished a foreign vessel in the ports of the United States is controlled in the courts of the United States by the general maritime law, and not by the laws of Great Britain.

It is probable that the obligation sued on is not negotiable, although by the terms of the charter-party it was to be. In the case of *The Serapis, supra,* Judge BROWN decides: "Such an instrument is only *quasi* negotiable, and is subject to all equities as respects the ship." As no equities are set up against it in this suit, whether the obligation sued on is negotiable or not is immaterial. The answer claims that the institution of the joint action against the agents of the ship in Liverpool *in personam* was a judicial concession that the vessel was without liability. This by no means follows. The district court treated the case made in the libel as a suit upon a bottomry bond, and it is strongly contended in this court by the learned proctor for the claimant that it is only as such a suit that it can be now considered. The libel does not designate

or describe the obligation sued on as a bottomry bond, and the evidence offered and considered is in accordance with the allegations in the libel. As the libel makes a case, it would seem that the libelants are entitled to a decree, although they may have failed to establish the obligation sued on as a valid bottomry bond.

### ON APPLICATION FOR REHEARING.

(May 12, 1890.)

PARDEE, J. The main contention of the proctor for claimants on this application for a rehearing is that the charter-party which authorized in advance the making of the particular obligation sued on, and provided that the same should be a lien on the ship, was not admissible in evidence under the pleadings. It is difficult to see how this can be claimed, when the claimant himself distinctly put at issue the want of authority. The answer alleges "that, the obligation sued on being payable in England, the rights and obligations thereto were governed by the laws of the kingdom of Great Britain, according to which a special authorization by the owners to the master of said ship was necessary before such an obligation could be legally made or issued; that no such authorization was ever obtained, or even asked for." The fifty-first admiralty rule provides, among other things, "that, when the defendant in his answer alleges new facts, these shall be considered as denied by the libelant, and no replication, general or special, shall be allowed." The ruling in the case of The Deronda, (not reported,) decided by this court several terms ago, is relied upon as the authority for excluding the charter-party. An examination of The Deronda record will show that the evidence excluded in that case was in relation to matters not put at issue by either libel or answer, and not referred to in either. In the opinion in this case, I did not find it necessary to determine whether the obligation sued on was or was not a valid bottomry bond. The examination that I have made on this rehearing, however, leads me to the opinion that, if necessary in order to justify the decree already rendered, I could find and sustain the same by authority that the obligation sued on was a valid bottomry bond. "If it manifestly appear that the wants of the ship were supplied in implicit reliance upon a lien for the debt which the law of the country would give in the absence of express contract for the purpose, a subsequent bond, being but a performance of the original intention, will be sustained by the English court of admiralty." Macl. Shipp. 54, citing The Alexander, 1 Dod. 278; The Vibilia, 1 W. Rob. 1; The Karnak, L. R. 2 Adm. & Ecc. 289.

The evidence in this case shows that the wants of the ship were supplied in reliance upon a lien authorized by the owner, and under such circumstances that, if furnished by a stranger, the law of the country where they were furnished, would give, in the absence of an express contract for the purpose, a maritime lien for the amount furnished. Again:

"The owners' prior consent to the master's hypothecation of the ship is, in view of the law, the strongest evidence of the necessity for it; the jealousy of the law for their protection is thus allayed; and its ordinary rule, first to com-

municate with the owners, or with the owners of the cargo, according as he means to hypothecate ship, freight, or cargo, or some or all of them, whenever the possibility of communicating corresponds with the existing necessity." Macl. Shipp. 56, citing a long line of adjudged cases.

The evidence in this case shows the owners' prior consent to the master's hypothecation; shows the necessity for the supplies, and the maritime risk undertaken. The application for a rehearing is denied.