## THE WYANDOTTE.

(District Court, E. D. Virginia. March 11, 1905.)

1. ADMIRALTY—ADVANCES TO MASTER—DRAFTS—SET-OFF.

   Where a charter party provided that the charterers' agents in foreign ports should be employed as brokers to attend to the ship's business, and such brokers procured libelants to purchase a draft drawn by the master to pay necessary and usual charges in the port where the ship received her cargo, which the master was bound to pay and did pay from the proceeds of the draft, the owners were not entitled to offset against the same, in the hands of the holder in good faith, claims against the charterers or their agents, either for dead freight or demurrage.

2. SAME—FREIGHT—POSSESSION BY MASTER—KNOWLEDGE OF LIBELANT.

   Where the purchaser of a draft drawn by the master of a vessel in a foreign port for advances to pay proper charges had no knowledge that at the time the draft was drawn the master was in possession of drafts

for freight, which he could have used to pay such charges, but which he in fact forwarded to the owners, and which they received, the fact that the charter party provided that the captain's ordinary disbursements at the port of loading should be advanced, payable from freight only, and that his disbursements might have been so paid, was no defense to the draft.

In Admiralty. Libel to recover advances made to ship's master in foreign port.

This libel was filed on the 10th of June, 1902, to recover the amount of a draft issued by the Wyandotte's master at the port of New Orleans on the 15th of November, 1901, for the ship's necessary disbursements at said port. The ship is owned by the British Maritime Trust, the claimant thereof; and by their representative at New York, on the 24th of September, 1901, was chartered to one W. W. Wilson, as agent for an undisclosed principal, under which she was to proceed to Port Eads for a cargo of wheat or maize; and, upon arriving at said port, to be loaded at Galveston or New Orleans, as directed by the charterers. The steamer at once proceeded to Port Eads, reaching there on the 10th day of October, 1902, and immediately by telegram advised the charterer of her arrival, and that she was awaiting orders. No orders were given until the 9th day of November, 1902, when the ship was ordered to New Orleans, to which port she at once proceeded, and reported to Baccich & Clement, the charterer's agents, to whom she was consigned. The loading was concluded on the 15th of November, and she on that day sailed from New Orleans to the port of Hull, England, where the cargo was discharged. Respondent insists that the lay days expired on the 10th day of November, 1902, and that demurrage was due from that day to and including the 16th of November, as well as for time for detention in unloading from December 14th to December 23d, both inclusive; also that there was a shortage of cargo of 162 tons, for which she was entitled to recover; and that on those two accounts there was due to them a sum in excess of the amount sued for. The charter party provided that the steamer should be consigned to the charterer's agents at the ports of loading and discharge, and should employ their broker to attend to the ship's business; that the cash for the captain's ordinary disbursements at the port of loading were to be advanced, if required, the steamer paying 2½ per cent. commissions and cost of insurance thereon; the amount advanced to be covered by the captain's draft, payable three days after the ship's arrival at the port of discharge, out of the freight on which the draft formed a lien. Prior to the captain's departure from New Orleans a statement was made and duly signed by him of the ship's disbursements, amounting to $1,614.52, for which he drew a draft on November 15th, payable to his own order five days after the arrival of the ship at the port of Hull, England, or wherever else the said voyage might terminate, unless the freight was collected sooner; the said draft reciting, among other things, that the same was for value received, and "for necessary disbursements owed by my vessel at this port, for the payment of which I hereby pledge my vessel and her freight; and I hereby assign to the legal holder of this obligation all my lien and claim against freight, vessel and owners, with power to take in my name all steps necessary to enforce the same; and my consignees at the port of discharge are hereby instructed to pay this obligation, and deduct the amount thereof from the freight due said vessel. In case of nonpayment, the holder shall also be entitled to the benefit of all liens in law, equity, or admiralty which the master or owners of the vessel may be entitled to against any part of the cargo or its owners for freight, compress, or other charges on the cargo paid by the vessel or master at the port of loading. This claim to have priority of payment over all others that may be presented against said freight and vessel. My vessel is now lying at the port of New Orleans, loaded with a cargo of grain, and ready to sail for Hull, England." This draft was regularly discounted by the libelants' agents at New Orleans for Baccich & Clement, the agents for the charterers, and for the ship at said port, and the proceeds arising therefrom duly applied to the payment of the ship's bills as certified to by the master. Prior to sailing, the charterers accounted with the ship's master for the difference of freight due by them, amounting to

£1,235, for which two drafts were given to the ship's master, and duly forwarded by him to the owners of the ship. The defense interposed by the claimant is that certain items included in the draft, amounting to $702.70, were not claims of a maritime character, and the libel as to them could not be maintained; that under the terms of the charter party the ship's master was limited to drawing upon the freight money, as distinguished from the ship itself; that the claimant should have the right to offset against the draft sued on for any loss sustained either by reason of shortage in the cargo, or demurrage; and that the damages in that respect more than covered the amount sued for.

Hughes & Little, for libelants.

Convers & Kirlin and Whitehurst & Hughes, for respondent.

WADDILL, District Judge (after stating facts as above). However important the questions discussed in this case may be from an academic or theoretical standpoint, so far as this particular case is concerned, there can be but little difficulty in reaching a just conclusion, and one which under the law the parties should be subjected to. The libelants are purchasers for value of the draft in question, drawn by the ship's master, and from the proceeds of which the ship's charges were paid—charges certified to by the master as necessary disbursements for the ship, and which the evidence shows were the customary charges in the port of New Orleans, and confessedly expenditures· the master had the right to make out of any funds in his hands belonging to the ship; and while it may be true, technically, that the draft in question is not negotiable because of the uncertainty in the time and place of its payment, it was of a quasi negotiable character (The Serapis [D. C.] 37 Fed. 436; Moore v. Robilant [C. C.] 42 Fed. 162, 165), discounted as other negotiable paper, and in the hands of an innocent holder, whose rights should be respected and protected, unless there is some controlling consideration to the contrary. The right to offset as against this claim rights or causes of action that the ship may have against the charterers or their agents, either for dead freight or demurrage, is so manifestly untenable and unreasonable under the facts of this case as not to be entitled to serious consideration. The draft drawn by the master on which the libelants advanced the money sued for was negotiated at the special instance and request of the ship's master by Baccich & Clement, the ship's agents, they, as to that transaction, being the joint representatives of the shipowner and the charterers, the charter party having prescribed that the charterers' agents should be employed as brokers to attend to the ship's business, and in what they did in this respect they acted not as the representative of the charterers, but the ship, and negotiated the loan to the libelants to raise the money to extinguish the ship's necessary charges at that port.

It would seem that ordinarily, at least, the ship's master would have the right to do what was done in this case. He was in a foreign port; and, while it is true his vessel was under charter, great delay had been encountered, and he had finally secured a cargo, or such a cargo as he could secure for his voyage, and it was necessary for him to go on. He was without money. The ship's owners

were in a foreign country, but with local representatives, who were also without means; and through the ship's representatives, at the master's instance, on the faith and credit of the ship, effected an arrangement to raise money to pay the ship's disbursements, and thereby enabled her to proceed on her voyage. Without this the ship and cargo would have been held indefinitely, to the serious loss of both properties. The principles of maritime law applicable to this case are too well settled to need special elaboration at this late day. The Grapeshot, 9 Wall. 129, 19 L. Ed. 651, will be found to be a specially interesting and instructive case, and in which Mr. Chief Justice Chase (pages 135, 136, 9 Wall., 19 L. Ed. 651) discussed the character and extent of the lien, and the circumstances under which the same would properly attach against the ship; and also the character of a bottomry bond and obligations more particularly like the one in this case, executed under circumstances and the terms of which were more or less different from the ordinary bottomry bond, but which would be recognized and enforced as such bonds. And in The Lulu, 10 Wall. 192, 19 L. Ed. 906, Mr. Justice Clifford, speaking for the Supreme Court (page 197, 10 Wall., 19 L. Ed. 906) said of the lien:

"Where it appears that the repairs and supplies were necessary to enable the vessel to proceed on her voyage, and that they were made and furnished in good faith, the presumption is that the vessel, as well as the master and owners, is responsible to those who made the repairs and furnished the supplies, unless it appears that the master had funds on hand, or at his command, which he ought to have applied to the accomplishment of those objects, and that they knew that such was the fact, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry, and to show that, if they had used due diligence in that behalf, they might have ascertained that the master, under the rules of the maritime law, had no authority to contract for the repairs and supplies on the credit of the vessel."

The Aurora, 1 Wheat. 102, 4 L. Ed. 45; The General Smith, 4 Wheat. 443, 4 L. Ed. 609; The Patapsco, 13 Wall. 329, 20 L. Ed. 696; The J. E. Rumble, 148 U. S. 1, 9, 11, 12, 13 Sup. Ct. 498, 37 L. Ed. 345; Moore v. Robilant (C. C.) 42 Fed. 162.

In this case the action was that of the agent of the owner, and entered into in good faith, when there was, in the opinion of the court, sufficient necessity for so doing; and the same should be held and treated as valid, whether considered a bottomry bond or not. The supplies were secured, and the draft issued pledging the ship as well as the freight money due, under such circumstances of exigency as would have caused a prudent owner, if present, to have ordered the supplies, and made provision for their payment on the faith of the ship; and a presumption arises as well that the necessity did exist as that the credit was given upon the faith of the ship. The Alexander, W. Robinson, 362; The Medora, 1 Sprague, 139, Fed. Cas. No. 9,391; The Grapeshot, 9 Wall. 141, 19 L. Ed. 651, The Lulu, 10 Wall. 192, 201, 203, 19 L. Ed. 906.

The respondents' contention is, however, that these conditions did not exist, because they say that the master had possession of freight money belonging to the owners, sufficient in amount to cover his obligations. If this be true, there is no pretense that the libelants had any knowledge of the fact, or that they were placed in such a

position as to afford them knowledge or opportunity of knowledge of the fact; and knowledge that Baccich & Clement, the ship's agents, may have had in this respect, if any, cannot be imputed to them. But it will be seen at a glance that the defense made is purely technical in character; for while it is true that the ship's master did have, after the adjustment of the difference of freight, drafts for the amount of the same, it does not follow that he necessarily had the money when this obligation was assumed, and when it was necessary for him to proceed on his voyage, or that he in fact had more than the draft in the owner's favor, and which it appeared he duly forwarded to them; and, if he did actually have the money, or a draft payable to his own order, the respondents should not be heard to interpose the technical defense they seek to make to defeat the right of the libelants to recover, when the freight money it is claimed the master had, and with which he could have paid his expenses, had been paid to and received by them. With the money in hand, to allow them to retain the same, and defeat libelants of their right of recovery, though their money has been properly expended and used to pay the very bills that the freight money would have been applied to, would be outrageously unjust and technical in the extreme. The ship owners having received the freight money that confessedly could have been applied to the disbursements made in their behalf, they should be estopped from making such technical defense to the payment of libelants' debt. Had the libelants not paid or furnished the money with which to pay the bills, the respondents would have been short just that sum in their freight money; and they should not, as against a person innocently furnishing the money to their own representative, and in their behalf, and after the same has been used on their account, be allowed to introduce as a defense a claim that they may happen to have against some third party, however fair and just as against such parties the claim may be. Manifestly, they have no such claim against their own representatives in this transaction, Messrs. Baccich & Clement, and their master, and it was only with them that the libelants acted in advancing the money on the master's draft sued for.

In the view taken by the court, the consideration of the question of which and which not of the particular items charged in the captain's draft are for disbursements of a maritime character need not be determined, since there is no doubt of the fact that out of the freight money paid to the captain, and by him transmitted to the owners, he could have paid the same that were paid out of the funds arising from the draft in question, and the owners should not be heard to defeat the recovery on that account. It will be borne in mind that in this case there is no suggestion of fraud, wrongdoing, or improper conduct on the part of this ship's master or their representatives. What they did was in good faith, with the bona fide purpose and in the interest of the ship. Not an expenditure was made that did not receive the sanction of the ship's master, and which he could not have paid from any money of the ship coming into his hands; and to defeat a recovery either because some of the items paid may not have been of a maritime character, or that the master

may have been limited by the terms of the charter in drawing his draft on the freight money, would be to defeat the recovery of a confessedly just claim in the hands of innocent holders upon the veriest technicality.

It follows from what has been said that a decree may be entered in behalf of the libelants for the amount sued for, with interest from the time the same was paid.