## THE INTREPID.[1]

### WRIGHT et al. v. THE INTREPID.

*(District Court, E. D. New York. March 26, 1890.*

1. COLLISION—PRACTICE—EXCEPTIONS TO ANSWER—SPECIFICATIONS.
   When exceptions to a pleading are drawn with several specifications, the failure to sustain any specification is fatal to the exception.
2. SAME—EXCEPTIONS—WHEN ALLOWED.
   Exceptions to pleadings in collision cases are permitted only when made in good faith, for the sole purpose of obtaining the full statement of facts which the law requires.

In Admiralty. On exceptions to answer.

The libel in this case set forth a case of collision by night in the East river, New York, between the steam-boat Morrisania, belonging to the libelants, bound up stream from Fulton street, New York, to Astoria, Long island, and a car-float in tow of the steam-tug Intrepid, bound down the river. The answer of the owner of the Intrepid consisted of 11

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

articles. The first 8 articles admitted or traversed or denied any knowledge as to the allegations of the libel. Article 10 set forth the faults charged by the Intrepid on the Morrisania. Article 9 was as follows:

"*Ninth.* The claimant is a corporation created under the laws of the state of Connecticut, engaged in the transportation of cargo and cars between New York and Wilson's Point, Conn., and is the sole owner of the steam-tug Intrepid, which is a new, large, and staunch steam-tug, 110 feet long on the keel, 22 feet beam, supplied and furnished with powerful engines for the transportation of car-floats. On Thursday, December 19, 1889, the said steam-tug Intrepid left Wilson's Point, Conn., with the car-float No. 1, with freight-cars thereon, securely lashed on the starboard side of said tug, the whole tow bound for New York. After reaching the East river, the wind was light from the north-west, the weather was clear starlight, and the tide was then, and at the time of the collision hereinafter mentioned, running strong flood. An experienced pilot and tug-boat captain was in charge in the pilot-house of the Intrepid, standing on the starboard side of the wheel; another pilot was on the port side, assisting in the steering. The regulation two white towing lights were carried at the tug's flag-staff, aft, one above the other, and one white light forward, with the red and green side lights on the top of the pilot-house, properly screened. Two white lights were also on the car-float on her flag-staff, with the red and green lights upon the pilot-house of the car-float, properly screened, together with a white light on the forward end of the float. The master of the car-float was in command, and in the pilot house of the float attending to her steering, and a licensed pilot was forward on the car-float, where he was devoting his undivided attention to his duties as lookout. When the tug and car-float had passed along the north side of Man O'War rock, they headed down in the middle of the river, steering a course rather towards the Brooklyn shore. When heading on that course, and proceeding slowly about two or three miles an hour, two steamboats, the Cape Charles and the Maine, were sighted down the river, below Tenth street, and showing all their lights, which bore on the Intrepid's starboard bow. The Intrepid blew two blasts of her whistle to signify that she would pass between the boats and the Brooklyn shore. The Cape Charles, which was ahead, answered with two blasts, and the ferry-boat Maine also blew two blasts in assent, and appeared to stop her engines. The Intrepid came on, and, when about abreast of the Tenth-Street buoy, was passing both of said boats in safety, when just as the Cape Charles was a little past abeam, and the bows of the Maine had been reached, a steam-boat astern (which turned out to be the Morrisania) sheered out from behind the Maine, directly in front of the Intrepid's course, showing her red light and white light, and at that moment blew one blast of her whistle. The Intrepid at once replied with several short alarm blasts, and backed full speed astern, but the Morrisania kept on making a rank sheer right in front of the Intrepid, rendering a collision inevitable, bringing the port side of the Morrisania across the front of the car-float, and doing herself serious damage. Said collision occurred about a length below the Tenth-Street buoy, and nearly abreast of North Fourth street, Brooklyn."

To the answer the libelants filed the following exceptions:

"The libelants except to the answer of the claimants herein, on the ground of the indefiniteness and uncertainty thereof, and—*First.* In that it fails to state: (1) The length of the float; (2) to what part of it the tug was made fast, whether with the tug's stern projecting aft of the float, or her stem forward of the float, or whether the stern of the float projected aft of the tug, or her stem forward of said tug, and how much. *Second.* In that it fails to state:

(1) Whether the colored and white lights of the tug, or either or both of them, were so fixed as to be visible over the tops of the cars on the said float. *Third.* In that it fails to state: (1) How many cars there were on the said float; (2) what part of her length they covered. *Fourth.* In that it fails to state: (1) What were the white towing lights which are described as regulation lights, which were carried on the tug's flag-staff aft, and through how many points of the compass they were visible; (2) what was the character of the two white lights which were on the float, and through how many points of the compass they were visible; (3) how far above the water and the deck the white towing lights of the tug were carried, and the distance of one above the other; (4) how far above the tops of the cars on the float said lights were; (5) whether the towing lights of the tug were aft of the smoke-stack of said tug or forward thereof; (6) how high above the water and the deck the two white lights on the flag-staff of the float were, and how far apart they were; (7) whether they were carried one above the other or horizontally; (8) whether they were towing lights or otherwise; (9) what was the character of the white lights carried forward on the tug, and on the forward end of the float; (10) how high above the water and the deck said lights were carried; (11) through how many points of the compass the same were visible. *Fifth.* In that it fails to state: (1) At what point or opposite what place the said tug was when the steam-boats Cape Charles and Maine were sighted; (2) how far apart they were; (3) how far either of them was from the Brooklyn shore or the Tenth-Street buoy; (4) in what part of the river they were; (5) how much they bore on the Intrepid's starboard bow; (6) how far off the Intrepid was when she blew the two blasts of her whistle; (7) how far off the Cape Charles was when she answered with two blasts of her whistle; (8) how far off the Maine was when she answered with two blasts of her whistle; (9) how far off she was when she appeared to stop her engine. *Sixth.* In that it fails to state: (1) On what course, and heading for what point, the Intrepid was when steering her course towards the Brooklyn shore; (2) how much the Intrepid changed her course after blowing the two whistles, if at all; (3) how much the steam-boats Cape Charles and Maine changed their courses; (4) how the Intrepid was heading at the time the Cape Charles was a little past the beam, and the bows of the Maine had been nearly reached. *Seventh.* In that it fails to state: (1) How far off the Morrisania was when her red and white lights were first seen; (2) where the Morrisania appeared to be when she was first seen,—opposite what point she was in the river; (3) how far distant she was from the Intrepid; (4) how far distant she was from the Maine; (5) who it was on the Intrepid or the float that first saw the Morrisania, and what report, if any, was made on the said tug or float, as to seeing the Morrisania. *Eighth.* In that it fails to state: (1) What the speed of the Intrepid was at the time the Morrisania was first seen; (2) what the speed of the flood-tide was, which is stated to run there with great speed; (3) in what direction the flood-tide was running; (4) what justification the Intrepid had for being on that side of the East river."

*George A. Black*, for libelant.
*Wing, Shoudy & Putnam*, for claimant.

BENEDICT, J. When exceptions to an answer are drawn in the manner adopted in this case, it seems proper to hold the failure to sustain any specification to be fatal to the exception to which such specification is attached. As it is plain that to each of the exceptions a specification has been attached that cannot be upheld, the result follows that all the exceptions must be overruled. Furthermore, if, as contended by the

claimant, the exceptions number 38 instead of 8, the fact that 38 exceptions are taken to an answer in a simple collision case, which seems to have been drawn with fullness and care, taken in connection with the character of most of the exceptions, gives to the proceeding the character of a cross-examination. Exceptions to pleadings in collision cases are permitted only when made in good faith, for the sole purpose of obtaining the full statement of facts which the law requires. Exceptions overruled.