ERIE & WESTERN TRANSP. CO. v. GREAT LAKES TOWING CO.

(District Court, D. New Jersey. December 29, 1910.)

1. ADMIRALTY (§ 65*)—PLEADING—EXCEPTIONS TO INTERROGATORIES.

Exceptions to interrogatories propounded to a party in an admiralty suit in their purpose and effect correspond to special demurrers and pleas in bar at common law, and the objectionable part of each interrogatory should be specifically pointed out that a clear and definite issue may be presented. Exceptions to a large number of interrogatories "for the reason that they are each and all open to one or more of the following objections," followed by a statement of a number of objections, do not produce a single issue and are bad.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 65.*]

2. ADMIRALTY (§ 64*)—PLEADING—INTERROGATORIES.

Admiralty rule 32, which authorizes interrogatories in an answer "touching any matters charged in the libel or touching any matter of defense set up in the answer," permits very comprehensive questions for the purpose of narrowing the issues. The extent to which the process of interrogation may properly be carried will necessarily vary according to the circumstances of each case, and must be regulated, when in dispute, by the court in its discretion.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 512; Dec. Dig. § 64.*]

3. ADMIRALTY (§ 64*)—PLEADING—INTERROGATORIES.

It is not ground for exception to interrogatories in the answer of a respondent in admiralty, propounded under admiralty rule 32, that they call for detailed information which will involve considerable labor and time, or that incidentally information may be elicited which the respondent would not be entitled to call for, if the main information sought is

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

proper under the rule, and to obtain it is the only purpose of the interrogatories.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 64.*]

4. ADMIRALTY (§ 64*)—PLEADING—INTERROGATORIES.

Where a libel sought to recover damages from a salvor under contract for rescuing a stranded vessel and her cargo, on the ground that the service was negligently performed, and in consequence there was a loss of a considerable part of the cargo and injury to the vessel, the allegations in regard to such matters being general, and it appeared that the contract was not made for some two weeks after the stranding and after the vessel had been abandoned by her crew, interrogatories in the answer requiring specific statements as to the guarding of the vessel, the kind and value of the cargo claimed to be lost, etc., *held* permissible, although very comprehensive and far reaching in character.

[Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 64.*]

In Admiralty. Suit by the Erie & Western Transportation Company against the Great Lakes Towing Company. On exceptions by libelant to interrogatories annexed to respondent's answer. Exceptions overruled.

Interrogatories propounded to the libelant, which it is required to answer under oath:

First interrogatory: Of what did the cargo of the "Wissahickon" of "about 3,360 tons of general merchandise" consist, specifying the exact quantity and kind of each item, and the value thereof, with copies of bills of lading or invoices of each item attached?

Second interrogatory: Specify in detail into what holds and cargo compartments the vessel was divided, and state exactly how she was loaded, showing what merchandise was loaded in each cargo compartment and where each of such lots of merchandise was loaded on board of said vessel, and when.

Third interrogatory: The libel alleging that the cargo belonged to various persons, state the name and address of each person owning any part of said cargo, and specify exactly the part belonging to said person, and the value thereof.

Fourth interrogatory: It is alleged in the libel that C. H. Sinclair, "representing all the interests concerned," arrived at the wreck and posted notices, etc., on December 15. 1909. State what interests were concerned, giving the name of each person or corporation, and specifying the interest of such person or corporation, including value.

Fifth interrogatory: What authority did C. H. Sinclair have? From whom did he receive said authority, and in what form? If such authority were in writing, set out copy of same; if not in writing, state exactly what authority was given to C. H. Sinclair, and what he was expressly authorized to do.

Sixth interrogatory: When did C. H. Sinclair arrive at the wreck; what did he do on board the wreck; what notice did he post; and where did he post same? Were the master and crew on board the ship when C. H. Sinclair was? If not, when had they left the ship, and had they left with intent to return; and, if they had left with intent to return, when did they intend to return? What was the weather while Mr. Sinclair was at the wreck? How did he get to the wreck, and how did he get away? Did he make any examination of the vessel, its outfit or cargo, and, if so, what did he find? If he examined the outfit of the vessel, was it all there at that time, and at the time he left? What is the name of the man on Duck Island whom Mr. Sinclair employed to watch the steamer, and where did the man live with reference to the location of the wreck? Was the man employed, and did he stay on board the wreck?

Seventh interrogatory: Referring to page 2 of the libel, wherein it is stated one R. Parry-Jones, representing all the interests, wrote to the respondent a

letter—who is Mr. R. Parry-Jones; what interest did he represent; by what authority did he represent such interests, and each of them? If said authority was in writing, what was it from each interest which authorized him by writing; and, if said authority was not in writing, from whom did such authority come, and where was it received, and what was said?

Eighth interrogatory: Did R. Parry-Jones represent any of the owners of said cargo, and, if so, what owners, and what parts of the cargo?

Ninth interrogatory: Referring to second page of the libel, where it is alleged that, "thereafter said R. Parry-Jones in his representative capacity orally accepted the first proposition contained in respondent's letter of December 24th," etc., what did Mr. R. Parry-Jones say, where was the conversation, who was present, and when was the conversation?

Tenth interrogatory: When did Mr. R. Parry-Jones notify this libelant that he had accepted proposition of respondent; and, if such notice were by letter or telegram, set out copy of such notice.

Eleventh interrogatory: Had Mr. R. Parry-Jones general authority to represent libelant prior to December 12, 1909; if so, was such authority in writing (setting forth copy of the writing), and was such authority given pursuant to resolution of the board of directors of libelant? If so, set out copy of resolution, and the date at which it was passed.

Twelfth interrogatory: Was any such authority given Mr. R. Parry-Jones on or after December 12, 1909? If so, what was the authority; if in writing, setting forth a copy; if not in writing, state by whom and where and when such authority was given, specifying what was said. If any such authority were given, state whether or not it was given by any officer of the company, setting out what was said or written, as the case may be, and whether such officer were authorized by the board of directors; and, if authorized by the board, set out copy of the resolution with date it was adopted.

Thirteenth interrogatory: Did libelant by its western manager, or other representative, after the release of said vessel from its stranded position, state in substance that Mr. R. Parry-Jones was not authorized to contract for the release of said vessel on behalf or in the name of libelant, or that the bills for releasing said vessel should be sent to the underwriters, and that same had not been contracted by libelant, or that said bills should be paid by the underwriters, and not by libelant.

Fourteenth interrogatory: Referring to page 3 of the libel, wherein it is stated, "when delivered at Detroit the Wissahickon and the lighter Reliance had on board together about 2,300 tons of cargo," etc., what part of the cargo and how much of the cargo was on board the Reliance and what was done with such parts of the cargo at Detroit; what cargo was on board the Wissahickon when delivered at Detroit, specifying what cargo and the quantity there was in each cargo compartment?

Fifteenth interrogatory: Who unloaded the cargo from the Reliance, and was it checked over when unloaded, and what did the checking tally show; what was done with each item; what was the value of each item; and, if sold, state to whom and for what price. What was the condition of each item of the cargo delivered from the Reliance, and what was the quantity and condition of each item delivered from the Wissahickon? What was done with each part of cargo of Reliance?

Sixteenth interrogatory: Was any of the cargo delivered at Detroit from the Reliance damaged; if so, how and to what extent damaged? Was any of the cargo delivered on board the Wissahickon at Detroit damaged? What was the character of the damage, and what was the amount of the damage, and what was done with each item of damaged cargo?

Seventeenth interrogatory: What fittings and furnishings of the steamer had disappeared, specifying in detail; when were they taken from the boat: and by whom? Was any taken from the vessel before December 29, 1909?

Eighteenth interrogatory: Referring to article fifth, page 3, of the libel, wherein it is alleged that the difference in quantity of cargo and loss of the steamer's fittings, furnishings, etc., was due to the negligent and improper way in which the respondent or its employés had conducted said wrecking operations, in what way was the conduct of said wrecking operations negligent; in what way was it improper? Did libelant at any time have any

representative at the said wreck? If so, name said representative or representatives, and when and during what time each was present?

Nineteenth interrogatory: Did libelant receive a report in writing of the conduct of such wrecking operations from respondent, dated on or about February 16, 1910?

Twentieth interrogatory: Were the wrecking operations described in such report negligent or improper? If so, in what respect?

Twenty-first interrogatory: Did libelant have any other information concerning the method of conducting said wrecking operations than that contained in the report of reports and correspondence of respondent? If so, when and from whom were such reports received, and what were such reports?

Twenty-second interrogatory: How has libelant suffered damage in about the sum of $60,000? What damage was there to fittings and furnishings claimed to have been caused by the conduct of respondent or its employés in said wrecking operations? What was the improper conduct or manner of doing the work complained of, which caused loss of fittings or furnishings?

Twenty-third interrogatory: What, in detail, are the items and amounts of damage making up the alleged claim of $60,000?

Twenty-fourth interrogatory: Was libelant at time of filing said libel bailee of cargo laden on steamer "Wissahickon"? What part or parts of said former cargo of the "Wissahickon" had been sold before filing said libel, and by whom, and for what amount was it sold, and whether by public or private sale?

Twenty-fifth interrogatory: Was libelant authorized to bring this suit by owners of cargo? If so, what owners, and was such authority in writing? Set out copies of such writings.

Twenty-sixth interrogatory: Have any claims for cargo loss or damage been assigned; if so, what cargo owners have assigned their claims, and to whom; setting forth copies of such assignments.

Dated at Buffalo, N. Y., August 12, 1910.

Brown, Ely & Richards, Proctors for Respondent.

The libelant hereby excepts to the interrogatories numbered 1 to 26 inclusive, addressed to it by the respondent herein for the reason that they are each and all open to one or more of the following objections:

(1) In that they are improper, irrelevant, and immaterial.

(2) In that they attempt to force libelant to prepare respondent's case for trial.

(3) In that they attempt to force libelant to prematurely offer proofs which should properly be offered at the time of the trial.

(4) In that they attempt to obtain information as to the matter at issue before trial for use on the trial.

(5) In that they attempt to deny libelant the right to have issues tried.

(6) In that they attempt to obtain names of libelant's witnesses and to discover in advance the nature of their testimony.

(7) In that they attempt to bring out matter properly the subject of cross-examination at the time of the trial.

(8) In that they attempt to bring out matter which should properly be brought out by respondent calling his own witnesses.

(9) In that they cover matters exclusively within the knowledge of the respondent.

(10) In that they inquire as to matters of hearsay and declarations of third persons which are not competent evidence.

(11) In that they attempt to introduce improper documentary evidence.

(12) In that they attempt to pry into matters not properly the subject of interrogatories.

(13) In that they attempt to go into the question of amount of damages and other questions connected therewith which should properly be gone into by a reference after trial.

(14) In such other respects as will be pointed out at the time of the hearing of these exceptions.

Burlingham, Montgomery & Beecher, Proctors for Libelant.

Burlingham, Montgomery & Beecher, for libelant.
Brown, Ely & Richards, for respondent.

RELLSTAB, District Judge. The libel is filed by the libelant as owner of the steamship Wissahickon, and as bailee of its cargo.

The interrogatories, 26 in number, are all excepted to. Libelant, instead of assigning specific objections to each interrogatory, merely states that they are all open to one or more of 14 enumerated objections. The interrogatories and objections are hereinbefore set forth. This method of excepting to interrogatories is bad. Exceptions in their purpose and effect correspond with special demurrers and pleas in bar at common law. Ben. Adm. (3d Ed.) § 466. They should be carefully prepared, specifying in the simplest and clearest manner, in separate exceptions, the matter excepted to. Id., § 470. The objectionable part of each interrogatory should be specifically pointed out, that a clear and definite issue may be presented. To say that each interrogatory is open to one or more of any number of objections does not produce a single issue. The utmost that can be learned from such manner of stating exceptions is that each one of these 26 interrogatories is open to at least 1 objection, but which of the 14 objections is left to speculation. Such method suggests a misunderstanding of the function of exceptions. To meet exceptions thus framed the respondent would have to test each one of its 26 interrogatories with each one of the 14 objections. This is an unnecessary burden, could easily be made intolerable, and cannot receive judicial sanction.

On the argument and in the brief submitted by libelant, the specific objections to each interrogatory were pointed out, and as respondent has availed himself of the time given for said purpose, and submitted an argument in reply thereto, such exceptions will be considered on their merits; but this indulgence is not to be taken as a precedent for future cases. Hereafter exceptions that fail to clearly and definitely point out the objectionable matter in the particular interrogatory excepted to will not be considered by the court, and may be struck out on motion of the interrogating party.

Rule 23 in admiralty provides that:

"All libels in instance causes, civil or maritime, shall state the nature of the cause; * * * and the libelant may further require the defendant to answer on oath all interrogatories propounded by him touching all and singular the allegations in the libel at the close or conclusion thereof."

And rule 32 provides that:

"The defendant shall have a right to require the personal answer of the libelant upon oath or solemn affirmation to any interrogatories which he may, at the close of his answer, propound to the libelant touching any matters charged in the libel, or touching any matter of defense set up in the answer."

The only exception is that referred to in rule 31, that the required answers do not expose libelant "to any prosecution or punishment for crime, or for any penalty or any forfeiture of his property for any penal offense."

"Touching any matters charged in the libel or touching any matter of defense set up in the answer" are comprehensive phrases. The prob-

184 F.—23

ing for definite issues, and the searching of the conscience in aid thereof, here authorized, is of the very genius of admiralty pleading and practice. It does not take place after the issues are joined, as in the jurisdictions where the pleadings and practice are based on the common law, but before issue, and for the very purpose of narrowing the issues to save both time and expense in the trials.

As was said by Judge Brown in The Mexican Prince (D. C.) 70 Fed. 246, at page 248:

"In any rational system of pleading, it is essential that the subject of litigation shall be reasonably defined, in order that the parties may know what they have to meet, that the case may be presented with intelligence, and the record restricted within appropriate limits, and useless expense avoided. It is the duty of the court to promote this end in all appropriate ways, in furtherance of justice, in pursuance of rule 46 and section 918 of the Revised Statutes [U. S. Comp. St. 1901, p. 685]."

To the same effect, see Benedict's Adm. (3d Ed.) § 440, p. 297.

In view of the comprehensive information sought by the interrogatories, an extended reference to the libel and answer is necessary.

The third article of the libel alleges on information and belief that on December 12, 1909, the steamship, while bound on a voyage from Erie, Pa., to Duluth, with a cargo of about 3,360 tons of general merchandise belonging to various persons, stranded on Outer Duck Island in Lake Huron; that on December 16th the tug "General," owned by respondent, arrived near the wreck and arranged to take off its crew; that on the same day C. H. Sinclair, representing all the interests concerned, arrived at the wreck and posted notices that the ship and cargo were not abandoned, and that any one interfering therewith would be prosecuted, and that he employed a man on Duck Island to watch the steamer; that on the 22d day of December R. Parry-Jones, representing all the interests, wrote respondent a letter, to which respondent replied by letter dated the 24th of that month, copies of such letters being attached to the libel and marked "A" and "B," respectively; that thereafter R. Parry-Jones, in his representative capacity, orally accepted the first proposition contained in respondent's letter, making a contract with it to relieve such steamer from the strand, and to deliver her and her cargo on board or in lighters at Detroit or Milwaukee, for the consideration of $30,000.

In its fourth article the libel alleges on information and belief that on or about the 29th day of said December, in pursuance of such contract, respondent's tugs "General" and "Thompson" with the lighter "Reliance" began wrecking operations, transferring some of the cargo to the lighter; that on February 7, 1910, the Wissahickon was finally relieved from the strand; and that thereafter she and the "Reliance" were towed to Detroit by tugs "Favorite" and "F. S. Schanck," arriving there on or about April 2, 1910.

In its fifth article it alleges that, when delivered at Detroit, the "Wissahickon" and lighter "Reliance" had on board together about 2,300 tons of cargo; that the difference of cargo, about 1,060 tons, together with the steamer's fittings and furnishings, etc., had disappeared, due to the negligent and improper way in which the respondent had conducted said wrecking operations.

In its sixth article it alleges that by reason of the respondent's failure to conduct said wrecking operations in a proper manner, and to deliver the "Wissahickon" with her fittings, furnishings, etc., and cargo on board or in lighters, libelant had suffered damages of about $60,000; and that no part thereof had been paid.

In its answer to the third article of the libel, respondent admits that it sent to R. Parry-Jones a letter dated December 24, 1909, in reply to his letter of December 22d, but denies that the copy of the letter attached to the libel, marked "B," is an exact copy thereof; and avers that it has no knowledge or information sufficient to form a belief as to whether or not on the day that the tug "General" was near the "Wissahickon's" wreck, or any other time, C. H. Sinclair, or any other persons representing all the interests concerned, or otherwise, arrived at said wreck and posted the notices or employed the watchman referred to; and upon information and belief denies that said R. Parry-Jones accepted the so-called proposition contained in respondent's letter of December 24, 1909; and denies that the said Jones thereby made a contract with respondent to release said steamer from the strand, or to deliver her with her cargo, at Detroit or Milwaukee, for any fixed sum of money. It also avers that, as to every other allegation of said third article, it has no knowledge or information to form belief, and therefore denies the same.

As to the allegations of the fourth article of the libel, respondent, on information and belief, denies that, in pursuance of the contract alleged in the libel, its tugs and lighters proceeded to the "Wissahickon," but admits the other allegations of said article. It also denies on information and belief the allegations of the fifth and sixth articles of the libel.

Respondent, further answering the libel, alleges on information and belief that such steamship and cargo were stranded in December, 1909, on said island, in an exposed position on a rocky shore, at about the close of navigation; that the weather was, and continued, especially severe; that such place was many miles from a telegraph station, and on an almost uninhabited island; that, unless released and taken to shelter, said vessel and cargo would have been lost; that respondent, with a valuable equipment, which it maintained for wrecking purposes, released said vessel and saved the greater portion of its cargo, pursuant to the acceptance of its bid contained in its letter of December 24, 1909, to Mr. R. Parry-Jones, and delivered the same in Detroit, where such vessel and cargo were accepted by libelant without protest or objection, and thereby performed the salvage service which it had undertaken; that respondent performed said salvage services at great risk to its property, and with great efforts and much suffering on the part of its employés, and in all things performed its agreement and saved property of great value; that no claim was made on it for payment of any loss or damage on account of loss of cargo, or any alleged negligent or improper method employed in conducting said wrecking operations, except until the libel was filed herein; that respondent is not informed as to the basis of said claims of negligence and damage, and cannot ascertain them from the very general allegations of the libel, and therefore attaches and propounds interrogatories to said libel.

It is to be noted that the basis of the action is the negligent and improper conduct of the respondent in the wrecking operations, and that the damages are the loss of a part of the cargo and the vessel's equipment. The steamship was stranded on the 12th of December, 1909, and respondent's contract to release the vessel and deliver her and her cargo at Detroit was not entered into until after the 24th (the exact date not being mentioned), and the wrecking operations did not begin until the 29th. On the 16th, about two weeks before such operations began, one C. H. Sinclair, said by libelant to represent all the interests concerned, arrived at the wreck, posted warning notices, and employed a watchman. Arrangements were made on the same day with respondent's tug to take off the crew. The contract is said by libelant to have been made between respondent and one R. Parry-Jones, representing all the interests.

The damages are stated in the most general terms, viz., that when the steamer arrived at Detroit on April 2, 1910, there was missing about 1,060 tons out of the 3,360 tons of cargo said to have been shipped at Erie, Pa. The damages are stated at about $60,000. The exact contract is in dispute, and the time when it went into effect does not appear.

The scope of the interrogatories under the admiralty rules was passed upon in the following: Havermeyers, etc., v. Compania, etc. (D. C.) 43 Fed. 90; The Mexican Prince, supra; La Bourgogne (D. C.) 104 Fed. 823; Bock v. International Nav. Co. (D. C.) 124 Fed. 711; Dana & Co. v. Cosmopolitan Shipping Co. et al. (D. C.) 131 Fed. 158; In re Knickerbocker Steamship Co. (D. C.) 136 Fed. 956; The Baker Palmer (D. C.) 172 Fed. 154; Chirurg v. Knickerbocker Steam Towage Co. (D. C.) 177 Fed. 943. They uniformly allow great latitude in eliciting testimony from the adverse party. In the Baker Palmer, Judge Dodge, in considering the extent of claimant's right in the premises, used language so appropriate to the present case that I am justified in quoting him in extenso. He said, referring to the interrogatories excepted to:

"Some call for distinct allegations regarding matters about which the libel as filed is not sufficiently specific. These, which will be identified below, the libelants are clearly bound to answer, as they would have been bound to amend the libel, had exceptions been filed. But the claimant has the right to go further than this under rule 32. Touching any matters alleged in the libel or touching any matter of defense set up in the answer he is entitled to compel his adversary to amplify the allegations of the libel, even though not open to exceptions for insufficiency as filed, for the purpose of dispensing wit' the taking of proofs regarding them, or for the purpose of bringing distinctly before the court the points relied on in defense, or for the purpose of obtaining evidence in support of the defense from the personal answers of his adversary. The David Pratt, 1 Ware (495) 509, Fed. Cas. No. 3,597; The Serapis (D. C.) 37 Fed. 436, 442; The Mexican Prince (D. C.) 70 Fed. 246: Benedict, Adm. Practice (3d. Ed.) § 519.

"The extent to which the process of interrogation may properly be carried will necessarily vary according to the circumstances of each case, and must be regulated, when it is in dispute, by the court in its discretion. The purposes for which it is allowed, as above stated, are to be kept in view; and it is also to be remembered that the matters regarding which interrogatories may be put are, by the language of rule 32, only the matters alleged in the libel or set up in defense by the answer, and that interrogatories are not to

be used for such purposes merely as those of finding out in advance what the adversary's evidence will be, or who his witnesses are, or of obtaining the production of letters or documents not in issue, or of cross-examining the adverse party regarding the truth of the allegations made in his pleadings. The Intrepid (D. C.) 42 Fed. 185; Havermeyers, etc., Company v. Compania Transatlantica (D. C.) 43 Fed. 90; Bock v. Navigation Company (D. C.) 124 Fed. 711. It is, however, not necessarily an objection to an interrogatory, otherwise permissible under rule 32, that some of the purposes above referred to may be incidentally accomplished by it."

The condition of the steamer and the cargo at the time the wrecking operations were begun is not stated. Manifestly, on the libelant's representations, the respondent cannot be charged with the loss that occurred before contracting to take charge of the vessel. The quantity and value of the entire cargo when shipped, its condition and how stored at the time of such contract, the condition of the vessel at such time, and the condition and amount of its cargo on its arrival at Detroit, are material on the question of damages, if any are recoverable. The name, whereabouts, and conduct of the watchman in charge of the steamer before such contract was made; the general authority of Jones in the premises, and particularly as to the making of such contract; whom he represented on such occasion; and what was said in his oral acceptance of one of the alternate propositions submitted by respondent, the names of the owners of the cargo, and their several interests therein; in what respect the wrecking operations were negligent or improper; what the character of the damages—are also material and relevant in view of the nature of this controversy, and the matters set up in the libel and answer.

It is difficult to see the materiality and relevancy of the interrogatories relating to the authority and conduct of Sinclair; but the libel's reference to his authority and conduct makes it sufficiently so for the purpose of propounding interrogatories in relation thereto.

The libel lacks fullness in respect to several matters which would seemingly be within the knowledge of the libelant. This may be a mere inadvertence, but it opens the way for a very searching probe. Some of the interrogatories propounded relate to such and other matters touched upon in the libel; others more particularly touch matters of defense set up in the answer.

The drawing of the line between permissible and objectionable interrogatories is oft a difficult task. The interrogatories here propounded are comprehensively framed and call for considerable detail information. Much time and labor will be expended, the names of some of libelant's witnesses will be disclosed, and the introduction of undisclosed documents may take place by making full answer thereto. This, however, is no reason for disallowing the interrogatories, where the purpose is not to harass, and such disclosures are but a mere incident to the main information sought. The interrogatories in this case, while intrusive and far reaching, are well within the scope of those allowed in the cited cases.

I have carefully analyzed each of these interrogatories and so considered them in relation to the matters charged in the libel and set up as defense in the answer, and to the objections interposed, and while the scope of the probe might be curtailed here and there, yet, keeping

in mind the purposes served by the use of interrogatories, and the scant reference in the libel to some apparently important, if not controlling, matters in the controversy, I am constrained to allow them to stand as framed.

The exceptions are therefore overruled.